RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0046p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　　　　　*Plaintiff-Appellee,*

　　　*v.*

LORD SHAWN RUSSELL,

　　　　　　　　　*Defendant-Appellant.*

No. 07-2354

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 06-00273—George C. Steeh, District Judge.

Argued: November 19, 2009

Decided and Filed: February 19, 2010

Before: MERRITT, GIBBONS, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** John T. Schuring, DICKINSON WRIGHT PLLC, Grand Rapids, Michigan, for Appellant. Nils R. Kessler, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** John T. Schuring, DICKINSON WRIGHT PLLC, Grand Rapids, Michigan, for Appellant. Nils R. Kessler, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

JULIA SMITH GIBBONS, Circuit Judge. Lord Shawn Russell was convicted of various drug- and firearm-related offenses and sentenced to 684 months' imprisonment. On appeal, he challenges his conviction and sentence on several grounds. For the reasons that follow, we affirm.

1

I.

On October 20, 2005, the Grand Rapids Police Department conducted a search of the residence at 912 Nagold Street Northwest ("Nagold"), in Grand Rapids, Michigan. Russell, present at the time of the search, told the officers that "he had no knowledge of any drug activity inside the home." However, police found drug paraphernalia in "[p]retty much every room" of the house. The police also found three cars near the house: a Cadillac parked next to the house, and a Lincoln and a Chevy Blazer parked in the street. The Cadillac was positioned against the property's fence in such a way that one could only access its trunk from inside the fence via a hole cut in the fence that lined up with the locking mechanism of the trunk. Three firearms were found in the trunk. Upon searching Russell's person, the police discovered the key to the Cadillac and $4,100 in cash in his shoes. Russell was taken into custody at the scene.

On the night of June 10, 2006, sheriff's deputies responding to shots fired at 3930 Mayfield Avenue ("Mayfield") encountered Russell outside the apartment complex and took him into custody again. Neighbors reported that, upon hearing gunfire, they saw Russell firing a handgun into the apartments and called the police. The sheriff's detectives later uncovered a .380 caliber semi-automatic pistol in the area where the neighbors had seen Russell digging after the shots were fired. Ballistics tests determined that shell casings found at Mayfield had been fired by the gun dug up in the backyard.

After obtaining a search warrant, the police searched Russell's Mayfield apartment. The police discovered much of the same types of drug paraphernalia that had been discovered at Nagold. They also found a receipt for a rent payment made by Russell for the Mayfield apartment, although the apartment was leased in the name of Jodee Griffee. The search also revealed two state vehicle registrations: one for a Chevy Blazer, registered to Russell and Kenneth Oyler at the Nagold address, and one for the Cadillac, registered to Russell and Brena Faye Watts. Russell's neighbors also told police that Russell appeared to be selling drugs from his apartment and the trunk of his Lincoln every day and at all hours. A search of the Lincoln revealed two more handguns, and a canine trained in the detection of narcotics alerted to $11,375 in cash

found on Russell's person.  Russell claimed that the cash was proceeds from gambling and selling cars but had no documentation to prove it.  Although a gunshot residue test performed on Russell's hands was negative, the forensic detective who conducted the test later testified that the result was not surprising given the length of time that elapsed between the shooting and the test.  Roughly a day and a half after the shooting, a maintenance worker at Mayfield discovered a small baggy containing cocaine base near a walkway outside Russell's apartment.  Testing of the baggy provided a virtual 100% match to a DNA sample from Russell.  A total of 3.96 grams of cocaine base and .56 grams of cocaine powder were confiscated from Mayfield.

On May 10, 2007, a grand jury returned an eight-count, second superseding indictment charging Russell with the crimes of maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1), for the Mayfield apartment (count 1) and the Nagold house (count 6); possession of cocaine base with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (count 2); using, carrying, and discharging a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (count 3); possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (counts 4 and 7); and felon in possession of firearms, in violation of 18 U.S.C. § 922(g) (counts 5 and 8).

Toward the end of *voir dire*, juror number four informed the district court that, as a paralegal for a tribal prosecutor's office, she helped to prepare cases, and worked with tribal law enforcement officers every day.  The juror explained that although she identified with the prosecutor "[p]rofessionally," she did not "[p]ersonally" lean in one particular direction with respect to the case.  She added that she did not think her professional capacity would cause her to hesitate to return a verdict of not guilty if the evidence called for it, nor would it lead her to be unfair to Russell.  She indicated that she understood the reasonable doubt standard, that the burden remained with the prosecutor to exceed that level of proof, and that it would be her responsibility as a juror to follow the law provided by the court.  The district judge denied defense counsel's motion to excuse the juror for cause, and counsel chose not to exercise a peremptory

challenge. Before the jury was empaneled, the district judge asked the prosecutor whether, in order to "play it conservatively," juror number four should be excused, but the prosecutor declined. Defense counsel asked no further questions of juror number four, adding only, "I made my motion," and the jury was empaneled.

During its case-in-chief, the government presented testimony by law enforcement officers and called four additional witnesses. James Tanner testified that Russell had sold him crack cocaine at the Mayfield apartment or out of Russell's car, and that he had seen Russell sell crack to "[f]ifteen to twenty" other people at various locations. Tanner further testified that he saw Russell count "thousands" of dollars in cash at his apartment. Jodee Griffee, Tanner's girlfriend, testified that she put her name on the lease for Russell's Mayfield apartment at Tanner's request but never lived there or paid rent of any kind. Russell had paid the security deposit. Kenneth Oyler also testified that Russell sold him crack cocaine on between twelve and thirty occasions. He recounted that, in exchange for crack cocaine, he helped Russell to purchase an automobile by signing the paperwork. He also traded his Smith and Wesson pistol to Russell for crack cocaine worth $50. Finally, the prosecution called Anna Pahman. Pahman testified that she began living with Russell at the age of sixteen; they lived together in several locations, including the Mayfield apartment. During that time, Pahman received crack cocaine from Russell roughly three times per week, and she saw Russell sell crack cocaine to about fifty different people. The sales took place at several locations, including at Mayfield. According to Pahman, drug sales totaled between $300 and $500 daily, and, at night, Pahman often watched Russell count between $15,000 and $20,000 in cash. Pahman testified that Russell was not employed in any capacity other than drug trafficking.

At no point did Russell move for a directed verdict. At the close of arguments, the district court recited the jury instructions, which had been decided upon by the court prior to trial and after submissions by both parties. As to counts 1 and 6—maintaining drug-involved premises under 21 U.S.C. § 856(a)(1)—Russell had requested that the court instruct the jury that the elements of the offense were:

(A)     First, that the defendant knowingly opened, leased, rented, used, or maintained a place, whether permanently or temporarily;

(B)     Second, that the defendant did so for the purpose of manufacturing, distributing, or using any controlled substance.

Russell further requested the following definitions:

(2)     "For the purpose" of manufacturing, distributing, or using a controlled substance means that drug manufacturing, use, or distribution was a significant or important reason why the defendant rented his apartment.  It need not have been the only reason, but it must have been one of the primary or principal reasons.

(3)     Proof that defendant manufactured, used, or distributed drugs at his apartment, <u>without more</u>, is not sufficient to convict Defendant under this statute.  The government must prove that Defendant rented or used the apartment for that specific purpose.

The government requested that, with respect to the purpose of Russell's maintenance of the property, "[m]anufacturing, distributing, and/or using controlled substances need not be the only purpose, or the primary purpose, for the use or maintenance of the place." The district court used a modified version of Russell's proposed instructions, essentially adopting the elements of the crime laid out in paragraphs A and B, but slightly altering the definitions in paragraphs 2 and 3 as follows:

([2])     "For the purpose" of distributing a controlled substance means that drug distribution was a significant or important reason for which the defendant rented or used his apartment.  It need not have been the only reason [deleting the last clause].

([3])     Proof that defendant distributed drugs at his apartment, on occasion [added], <u>without more</u>, is not sufficient to convict Defendant under this statute.  The government must prove that Defendant maintained the apartment for that purpose [deleting "specific"].

Russell objected to the court's modifications, but the instruction was read to the jury as written.  The jury returned a verdict of guilty on all counts.

At sentencing, a central issue in dispute was the amount of cocaine base for which Russell could be held responsible because, as stated above, only 3.96 grams of the

drug were found at Mayfield. The Presentence Investigation Report ("PSR") recommended a base offense level of 34, converting the $11,375 found on Russell into 322.48 grams of cocaine base. The government's sentencing memorandum largely tracked the recommendation in the PSR and argued that the court should convert the entire $11,375 into a quantity of cocaine base. The government recalled evidence at trial that established Russell's primary source of income to be cocaine sales, but argued that even if Russell had income from other sources, meaning not all of the $11,375 could be converted to cocaine base, there was not enough evidence of alternative sources to warrant a base offense level below 34. Because the base offense level of 34 covers conduct involving 150 to 500 grams of cocaine base, the government pointed out that the district court "would have to find that Russell made less than 37% of his profits from crack . . . to find a base level of 32 or lower." This figure was calculated by assuming that, at $800 per ounce, 150 grams of crack would be worth about $4,285, or roughly 37% of the $11,375 found on Russell at Mayfield.

At the sentencing hearing, the prosecutor offered evidence that the proper street price of cocaine base was $800 per ounce—a figure that Russell, again, did not dispute. Detective Mike Rozema of the Grand Rapids Police Department testified that $11,375 converts to roughly 11 pounds of marijuana, but that there was no evidence indicating that Russell sold marijuana in quantities that large, thereby ruling out marijuana as a significant alternative income source.

The government again called Anna Pahman, who testified that when she began living with Russell, she was not only his girlfriend but also worked for him as a prostitute. Pahman earned no less than "$50 per trick," totaling between $100 and $200 per night, which she handed over to Russell in exchange for crack cocaine. Pahman estimated that at least ten girls worked for Russell as prostitutes, but estimated that only $300 of the $11,375 was attributable to revenue from their prostitution. Pahman also helped shed light on Russell's income from drug dealing. She stated that she sometimes helped Russell handle drug deals. According to Pahman, Russell dealt methadone and marijuana "once in a while, . . . but not that often," and that his primary business was

dealing crack cocaine. When asked where she thought Russell got the $11,375, Pahman replied, "The only way to my knowledge would be selling crack cocaine."

The district judge found that "[t]he government's formula for conversion is not in dispute based upon a street value of $800 for an ounce of cocaine." He further found that Russell "occasionally sold marijuana, . . . occasionally sold methadone, and he certainly realized some level of income from managing prostitutes." On the question of "ultimately how much of that $11,000 should be treated . . . as the proceeds of the sale of crack cocaine," the district judge found that "[t]here may have been several thousands [*sic*] dollars attributable to illegal activity other than the sale of crack cocaine, but as argued in the government's brief, in order to find a level less than the level that was adopted by probation in its [PSR], the Court would have to find that [more] than 4,700." The judge concluded that a finding that less than 37% of the $11,375 was attributable to the sale of crack cocaine "would not be a reasonable conclusion I think based upon the evidence that I heard at trial, as well as the evidence received during the course of this hearing." Therefore, the district judge applied a base offense level of 34, in accord with the PSR, and sentenced Russell to 684 months' imprisonment. Russell timely appealed.

## II.

On appeal, Russell argues seven claimed errors in the district court proceedings: (1) he was denied an unbiased jury by the district court's failure to excuse juror number four for cause; (2) the jury instructions on the § 856(a)(1) charges for maintaining a drug-involved premises were improper in their definition of "purpose"; (3) his conviction for maintaining the Nagold home (count 6) was based on insufficient evidence; (4) because count 6 was based on insufficient evidence, count 7, possession of a firearm in furtherance of maintaining the drug house at Nagold must also be reversed; (5) the jury instructions on the § 856(a)(1) counts constituted a constructive amendment to the indictment because they included more possible activities than "maintaining" the property; (6) his conviction for possession of crack cocaine with intent to distribute was based on insufficient evidence; and (7) the district court abused its

discretion by converting the $11,375 in cash to cocaine base to determine the applicable base offense level.

## A. Implied Juror Bias

"The doctrine of presumed or implied, as opposed to actual, bias provides that, in certain extreme or exceptional cases, courts should employ a conclusive presumption that a juror is biased." *Johnson v. Luoma*, 425 F.3d 318, 326 (6th Cir. 2005) (internal quotation marks and citations omitted). "A finding of implied bias is appropriate only 'where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances.'" *Id.* at 326 (quoting *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988)). "These extreme cases occur when a juror has 'a relationship in which the potential for substantial emotional involvement, adversely affecting impartiality, is inherent.'" *United States v. Frost*, 125 F.3d 346, 379 (6th Cir. 1997) (quoting *Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir. 1990)) (internal quotation marks omitted). Although the doctrine of implied bias existed prior to *Smith v. Phillips*, 455 U.S. 209 (1982), Justice O'Connor's concurrence in that case describes the potential application of the doctrine by providing examples of extreme or exceptional cases: "[T]hat the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." 455 U.S. at 222 (O'Connor, J., concurring). As this court has noted, there is a question as to the continued viability of the implied-bias doctrine after *Smith*. *See Johnson*, 425 F.3d at 326.

In general, we review a district court's decision to deny a challenge of a juror for cause for abuse of discretion. *Cox v. Treadway*, 75 F.3d 230, 239 (6th Cir. 1996) (citing *Marks v. Shell Oil Co.*, 895 F.2d 1128, 1129 (6th Cir. 1990)). However, we have neither applied an abuse-of-discretion standard when reviewing for implied bias nor have we explicitly stated the proper standard of review. *See Frost*, 125 F.3d at 380 n.15. Our sister circuits have applied different standards of review, considering it as "a question

of law," *see Hunley v. Godinez*, 975 F.2d 316, 318–19 (7th Cir. 1992), "a mixed question of law and fact" reviewed *de novo*, *see Fields v. Brown*, 503 F.3d 755, 770 (9th Cir. 2007), or "within the discretion of the trial court . . . [and] accorded deference," *see United States v. Greer*, 285 F.3d 158, 172 (2d Cir. 2002).

We find it unnecessary to decide whether the implied-bias doctrine remains viable or which standard of review is appropriate in this case. Assuming the viability of the doctrine, Russell cannot demonstrate implied bias under any standard of review. The record is devoid of facts that would support such a finding. Although juror number four was a paralegal at a tribal prosecutor's office, there is no indication that juror number four ever had contact with non-tribal federal or state prosecutors of any kind. There are no facts in the record to suggest that juror number four's position created the sort of exceptional circumstance about which Justice O'Connor was concerned.

## B. Meaning of "Purpose" in § 856

This Court reviews challenges to jury instructions for abuse of discretion. *United States v. Kuehne*, 547 F.3d 667, 679 (6th Cir. 2008) (citing *United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007)). "When jury instructions are claimed to be erroneous, [this Court] review[s] the instructions as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision." *United States v. Frederick*, 406 F.3d 754, 761 (6th Cir. 2005). "A judgment may be reversed based upon an improper jury instruction 'only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial.'" *Kuehne*, 547 F.3d at 659 (quoting *United States v. Harrod*, 168 F.3d 887, 892 (6th Cir. 1999)) (internal quotation marks omitted).

The offense of maintaining a drug-involved premises under 21 U.S.C. § 856(a) requires proof that the defendant "knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, *for the purpose of* manufacturing, distributing, or using any controlled substance . . . ." 21 U.S.C. § 856(a)(1) (emphasis added). The district court instructed the jury that the government could show that Russell maintained a place "for the purpose of" distributing drugs if the "drug

distribution was a *significant or important reason* for which the defendant rented or used his apartment." Russell argues now, as he did at trial, that the district court erred by not following the interpretation of § 856(a)(1) offered by the Tenth Circuit—namely, that the drug-related purpose for maintaining the premises must be "at least *one of the primary or principal uses* to which the house is put." *See United States v. Verners*, 53 F.3d 291, 296 (10th Cir. 1995) (emphasis added). According to the Tenth Circuit, the drug-related purpose "must be more than a mere collateral purpose of the residence." *Id.* at 296.

The district court borrowed the "significant or important" language used in the jury instruction from the Fifth Circuit, which held that the common understanding of "purpose" was sufficient and that the jury needed no further instruction on a definition. *United States v. Roberts*, 913 F.2d 211, 220 (5th Cir. 1990). It later noted that "section 856(a)(1) does not require that drug distribution be the *primary* purpose, but only a significant purpose." *United States v. Soto-Silva*, 129 F.3d 340, 346 n.4 (5th Cir. 1997); *see also United States v. Church*, 970 F.2d 401, 406 (7th Cir. 1992) (citing *Roberts* approvingly and rejecting the proposition that the government cannot sustain a conviction under § 856 if drug distribution is "but one of several uses of a residence"). Each court to have addressed this issue has agreed that the "'casual' drug user does not run afoul of [§ 856] because he does not maintain his house for the purpose of using drugs but rather for the purpose of residence, the consumption of drugs therein being merely incidental to that purpose." *United States v. Lancaster*, 968 F.2d 1250, 1253 (D.C. Cir. 1992).

We have never specifically endorsed an instruction defining the "for the purpose of" language of 21 U.S.C. § 856(a)(1). Today we conclude that the district court clearly did not abuse its discretion in crafting the jury instructions as it did. The instructions were not misleading or incorrect. They properly conveyed a reasonable interpretation of § 856 and included a definition of "purpose" that has been adopted by a majority of circuits to have reached the issue. We therefore affirm Russell's convictions on the relevant counts.

We further hold that the definition of "purpose" adopted by the district judge—that the government need only prove that the defendant's drug-related purpose for maintaining a premises be "significant or important"—is the proper definition of "purpose" in this circuit in the context of § 856 prosecutions.

### C. Constructive Amendment of the Indictment

Because Russell failed to object at trial to the jury instruction as constituting a constructive amendment to the indictment, we will review only for plain error. *Id.* Thus, Russell must show: "(1) an error, (2) that is plain, and (3) that affects his fundamental rights." *United States v. Vasquez*, 560 F.3d 461, 470 (6th Cir. 2009) (citing *United States v. Martin*, 520 F.3d 656, 658 (6th Cir. 2008)). If he satisfies these conditions, we have discretion to "correct the error only if the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.* Plain error does not require reversal if it is harmless beyond a reasonable doubt. *Id.* The defendant bears the burden of establishing that a constructive amendment has occurred. *United States v. Chilingirian*, 280 F.3d 704, 712 (6th Cir. 2002).

This Court explained in *Kuehne* that:

> A constructive amendment "results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which modify essential elements of the offense charged such that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment."

547 F.3d at 683 (quoting *United States v. Martinez*, 430 F.3d 317, 338 (6th Cir. 2005)). "To determine whether a constructive amendment has occurred, therefore, we review the language of the indictment, the evidence presented at trial, the jury instructions and the verdict forms utilized by the jury." *Kuehne*, 547 F.3d at 683–84.

In instances in which a jury is "charged regarding two different methods of committing the same offense rather than a wholly distinct offense, a variance occur[s] and [the defendant] must demonstrate that his substantial rights were affected by the district court's erroneous jury instruction." *Id.* at 685. Substantial rights are only

affected in this context "'when a defendant shows prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions.'" *Id.* (quoting *United States v. Hynes*, 467 F.3d 951, 962 (6th Cir. 2006)).

Counts 1 and 6 of the second superseding indictment charged Russell with "Maintaining a Drug-Related Premises" in violation of 21 U.S.C. § 856(a)(1). The district court's jury instructions, however, tracking the language of the statute itself, required the jury to find that "the defendant knowingly *opened, leased, rented, used, or maintained*" such a premises. According to Russell, the jury instruction constituted a constructive amendment because it expanded the range of activity for which the jury could return a verdict of guilty.[1] However, because the added verbs—"open," "lease," "rent," and "use"—tracked the language of the statute, the change constituted a variance and not a constructive amendment. Thus, Russell must show that the change affected his substantial rights, which he cannot do. He argues that the added language made unclear what evidence the jury relied upon in reaching its verdict. However, the language on the verdict form was limited to "maintaining a drug-involved premises," and the jury foreperson similarly recited that language when reading the verdict to the court.

Furthermore, Russell fails to satisfy the plain-error standard of review that any error that did occur seriously affected the fairness, integrity, or public reputation of the judicial proceedings. We therefore conclude that the jury instructions did not constitute a constructive amendment of the indictment.

### D. Sufficiency of the Evidence

When deciding whether a conviction is supported by sufficient evidence, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Kone*, 307 F.3d 430, 433 (6th Cir.

---

[1]Not only did Russell not object to this language in the jury instructions at trial, but Russell's own proposed jury instructions included the language he now challenges. This fact alone could be deemed a waiver of this argument. Nonetheless, we address the merits of the claim.

2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  Because Russell failed to move for a judgment of acquittal at either the close of the government's case or at the close of his own case, we may reverse his conviction only if the record is "'devoid of evidence pointing to guilt,'" such that a manifest miscarriage of justice occurred.  *See United States v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002) (quoting *United States v. Abdullah*, 162 F.3d 897, 903 (6th Cir. 1998)).

*1. Maintaining the Nagold Residence*

Russell first argues that there was insufficient evidence to support his conviction under § 856(a)(1) for maintaining the property at 912 Nagold for drug-related purposes. To convict Russell under this provision, the government must prove beyond a reasonable doubt that he (1) knowingly, (2) maintained any place, whether permanently or temporarily, (3) for the purpose of distributing a controlled substance.  *See Frost*, 1999 WL 455434, at *3 (citing *United States v. Roberts*, 913 F.2d 211, 219 (5th Cir. 1990)). To satisfy the "maintaining" element of the statute, it is not necessary that the defendant lease or own the home.  *See United States v. Acosta*, 534 F.3d 574, 591–92 (7th Cir. 2008) (finding that a jury could infer that the defendant maintained the premises).  Acts that evidence "maintenance" are "such matters as control, duration, acquisition of the site, renting or furnishing the site, repairing the site, supervising, protecting, supplying food to those at the site, and continuity . . . ."  *United States v. Clavis*, 956 F.2d 1079, 1091 (11th Cir. 1992).  "Where the defendant lives in the house, this element is normally easily proved."  *Verners*, 53 F.3d at 296.

A review of the evidence presented at trial reveals considerable direct evidence supporting a finding that Russell maintained the Nagold home.  Russell was found at Nagold when it was searched, at least one automobile was registered to Russell at the Nagold address, and the key to a Cadillac registered to Russell and parked in a hole in the Nagold fence was found in Russell's shoe.  Drugs and products used to use, package, and sell drugs were found in nearly every room, suggesting the home was maintained for drug-related purposes.

Substantial circumstantial evidence also supports conviction.  Although Russell's presence during the search does not conclusively establish maintenance, no other people were present at the house when the police arrived, and he spoke to the officers as though he knew what was going on inside.  Furthermore, Russell parked the trunk of his Cadillac, which was loaded with guns, through a hole in the fence so that it could only be accessed from within the Nagold premises, and he kept the key to the trunk in his shoe.  A jury could reasonably infer that he took these steps in order to defend the house.  As mentioned in *Clavis*, evidence that Russell protected the house is evidence that he "maintain[ed]" the premises.  956 F.2d at 1091.  There is no evidence in the record to suggest that Russell was merely a casual visitor.

The evidence is sufficient to allow a rational trier of fact to convict Russell on the charge of maintaining Nagold for drug-related purposes, and his conviction on this count is affirmed.  Because we affirm, we also reject Russell's claim of insufficient evidence to convict him of possession of a firearm in furtherance of maintaining Nagold in violation of 18 U.S.C. § 924 (c)(1)(A)(i).  As Russell concedes, success on this claim was predicated on us finding insufficient evidence to support his conviction of maintaining Nagold for drug-related purposes.  The jury's conviction on this count is therefore also affirmed.

### 2. Possession with Intent to Distribute

Russell contends that there was insufficient evidence to support his conviction of possession of cocaine base with intent to distribute, in violation of 21 U.S.C. § 841(a).  The elements of the offense are that the defendant: "(1) knowingly, (2) possessed a controlled substance, (3) with intent to distribute it." *United States v. Coffee*, 434 F.3d 887, 897 (6th Cir. 2006).  "Possession" can be proven either by evidence of actual possession or constructive possession. *See United States v. Welch*, 97 F.3d 142, 150 (6th Cir. 1996).  "To establish constructive possession, the evidence must indicate 'ownership, dominion, or control over the contraband itself or the premises or vehicle in which the contraband is concealed.'  Physical proximity to drugs, or mere presence in an area where drugs are found, is not sufficient." *United States v. White*, 932 F.2d

588, 589 (6th Cir. 1991) (*per curiam*) (quoting *United States v. Gordon*, 700 F.2d 215, 217 (5th Cir. 1983)).

Russell claims that because the cocaine base was found in the public area of the Mayfield apartments, it is "impossible" to prove that he ever had ownership, dominion, or control over it. He further argues that the delayed discovery of the drugs despite considerable police searches in the interim renders the circumstances of the discovery suspicious. Relying on *United States v. Vasquez-Chan*, 978 F.2d 546, 551 (9th Cir. 1992), and *United States v. Townley*, 942 F.2d 1324, 1326 (8th Cir. 1991), Russell also discounts the DNA evidence found on the baggy, analogizing it to the fingerprint evidence found insufficient to establish possession in those cases.

The record presents copious evidence supporting the jury's finding. For example, several witnesses testified that they had purchased drugs from Russell; police uncovered physical evidence in the Mayfield apartment indicating Russell was dealing drugs; and Anna Pahman testified that she witnessed Russell conduct dozens of drug transactions while she was living with him. The DNA evidence is simply one piece of the total evidence supporting a finding of guilt and, given the other proof, permits an inference that Russell had possessed the baggy for the purpose of distributing its contents. This case is quite different from *Vasquez-Chan* and *Townley*, where fingerprints were determined to be insufficient to convict, in view of the lack of other evidence supporting guilt and the varying inferences that the fingerprints themselves permitted.

The voluminous evidence of Russell's drug-dealing activities, including the DNA evidence on the cocaine baggy, provides an adequate basis on which a reasonable jury could have convicted Russell for possession with intent. Therefore, Russell's conviction on this count is affirmed.

### E. Calculation of Amount of Crack Cocaine for Sentencing

At sentencing, the prosecution bears the burden of proving by a preponderance of the evidence the quantity of drugs involved in an offense. *United States v. Sims*, 975

F.2d 1225, 1242 (6th Cir. 1992). The district court's determination of the quantity of drugs for which a defendant is held responsible is a factual finding that we review for clear error. *United States v. Walton*, 908 F.2d 1289, 1300–01 (6th Cir. 1990). "A factual finding is clearly erroneous where, although there is evidence to support that finding, 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Ware*, 282 F.3d 902, 907 (6th Cir. 2002) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

> The United States Sentencing Guidelines provide:
>
> Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.

U.S.S.G. § 2D1.1 app. note 12 (2007). "[T]he evidence supporting the [sentencing court's] estimate 'must have a minimal level of reliability beyond mere allegation, and the court should err on the side of caution in making its estimate.'" *United States v. Sandridge*, 385 F.3d 1032, 1037 (6th Cir. 2004) (quoting *United States v. Owusu*, 199 F.3d 329, 338 (6th Cir. 2000)). Seized funds can be converted into an equivalent amount of drugs. *Id.* To do so, "the Government must prove by a preponderance of the evidence both the amount of money attributable to drug activity and the conversion ratio—i.e., the price per unit of drugs." *Id.* (citing *United States v. Jackson*, 990 F.2d 251, 253 (6th Cir. 1993)). Russell never challenged the conversion ratio used by the government ($800 per ounce). Therefore, the only issue on appeal is the amount of money attributable to the sale of cocaine base.

Russell claims that the district court clearly erred when it converted the entire $11,375 found on him at his arrest into cocaine base. Further, he argues that the district court's finding that no less than $4,700 of the $11,375 was attributable to the sale of cocaine base did not involve a proper "weighing of the evidence." He argues that his sentence should be vacated under *Sandridge*, in which we held that the government had

failed to meet its burden of proving at sentencing that money found on the defendant was linked to the sale or purchase of drugs. *Id.* at 1037–38.

Russell's arguments are without merit. First, the district court never found that the entire quantity of cash derived from the sale of cocaine base. Rather, the district court found that, because Russell would receive the same base offense level should it calculate any amount of cocaine base greater than or equal to 150 grams, it only needed to find that the cash equivalent of the minimum 150 grams—or 37% of the cash found, roughly $4,700—was attributable to cocaine to reach the same base offense level applicable to $11,375 worth of cocaine base sales. At sentencing, the government presented evidence indicating that Russell did not deal in large quantities of marijuana, and Anna Pahman testified that a large majority of his income originated from selling cocaine. She further testified that any sales of marijuana or methadone were "occasional" or "once in a while" and would not have constituted $11,375. Pahman also testified that Russell's proceeds from managing prostitutes were minimal. The district court therefore found that it "would not be a reasonable conclusion" to find that Russell's proceeds from selling cocaine base were less than $4,700.

The evidence that the government presented at Russell's sentencing describing the proceeds Russell derived from the sale of cocaine base was far more compelling than anything the government presented in *Sandridge*, easily distinguishing that case. Thus, the district court's factual conclusions were not clearly erroneous and we affirm Russell's sentence.

### III.

For the reasons discussed above, we affirm Russell's conviction and sentence.