NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0588n.06

No. 25-1076

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Dec 19, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| FRANCHOT BARNES, | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | OPINION |
| | ) | |

Before: BATCHELDER, GILMAN, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. A federal grand jury issued three superseding indictments charging Franchot Barnes with drug offenses. He pleaded guilty to charges contained in the third of these. He then sought to withdraw his plea, arguing that prior counsel had misadvised him regarding a plea offer and had failed to effectuate his desire to enter an open plea to the first, now superseded, indictment. The district court denied that motion and sentenced him to 324 months' incarceration. He now appeals, challenging the denial of his plea-withdrawal motion and the reasonableness of his sentence. We AFFIRM.

I.

As often happens in unfolding drug conspiracy cases, a grand jury charged Franchot Barnes in a series of indictments, each of which superseded the previous one. On June 20, 2024, Barnes pleaded guilty to two counts of the third superseding indictment—conspiring to distribute and possess with intent to distribute controlled substances, and attempted distribution of cocaine. But

as Barnes tells it, he "always wanted to plead guilty to the crime he committed"—that is, the charges contained in his first superseding indictment, conspiracy to distribute and attempted distribution of over 500 grams of cocaine. Appellant Br. at 3.

According to Barnes, the Government "offered a Rule 11 plea agreement" shortly after he was named in the first superseding indictment and surrendered to police. *Id.* Barnes's current counsel states that he has never "seen this Rule 11 offer," but provides his "understanding" that it "would have eliminated one of the charges and resulted in a favorable recommendation." *Id.* at 3–4. Although Barnes "said he wanted to accept that agreement, . . . his then counsel advised [him] not to take the plea agreement," citing "forfeiture concerns." *Id.* at 3. Nonetheless, Barnes "told his counsel that he wanted to plead guilty without accepting the Rule 11 offered by the Government." *Id.* at 3–4. But Barnes didn't plead guilty while represented by his first counsel. And the Government's purported plea offer seems to have lapsed by the time Barnes retained a second attorney, though that is far from clear.

Within a few weeks, the Government obtained a second superseding indictment that added methamphetamine allegations to the conspiracy count, increasing the mandatory minimum sentence upon conviction from five to ten years. Eventually, a third superseding indictment increased the quantity of cocaine tied to Barnes from over 500 grams to over 5 kilograms. At this point, Barnes's third and present attorney advised him to enter an open plea to the third superseding indictment.

At the change-of-plea hearing, the district court asked whether Barnes had questions about the penalties he was facing as a result of his plea. In response, Barnes asked detailed questions about the quantity of cocaine he was admitting to, noting that his current indictment said "five kilos and then the other one it s[aid] 500 grams or more." R. 483, Plea Hr'g Tr., PageID 2192.

But after the Government provided an explanation for the increased quantity, Barnes indicated that he understood. Barnes also indicated that he had "wanted to plead guilty" to an earlier indictment with a "five-year mandatory minimum," but had waited due to counsel's advice.[1] *Id.* at 2204. Ultimately, however, Barnes concluded that "I don't have a choice. I guess I have to plead guilty. I mean, I plead guilty, you know? I plead guilty." *Id.* at 2207.

The court then engaged in a thorough Rule 11 colloquy with Barnes, explaining the sentencing process and the rights he would be giving up by pleading guilty. After Barnes indicated that he understood, the court accepted his plea as knowing and voluntary.

Shortly after an initial PSR came back with an unexpectedly high suggested Guidelines range, Barnes moved to withdraw his plea. But he disclaimed any desire to exercise his right to jury trial. Instead, Barnes requested that he be allowed "to plead to either the original Rule 11 [agreement] or the First Superseding Indictment." R. 486, Mot. to Withdraw, PageID 2289. After briefing on the issue, the district court denied the motion without a hearing.

At sentencing, the district court calculated Barnes's offense level as 39 and his criminal-history category as III, producing a Guidelines range of 324 to 405 months' incarceration. That offense level was based on a drug weight of between 15 and 50 kilograms of cocaine, as supported by intercepted text messages and phone calls between Barnes and his co-conspirators. It also incorporated two enhancements at issue here. First, the court applied an enhancement for obstruction of justice: the court found that Barnes had attempted to frustrate forfeiture by hiding jewelry in Los Angeles and by attempting to liquidate one of his Michigan houses. Second, the

---

[1] It's not clear from the briefing whether Barnes blames his first or second attorney (or both) for his failing to enter an open plea. At the sentencing hearing, Barnes seems to focus on his *second* attorney's recommendation not to enter a plea because a jurisdictional defense may have been available and because counsel wanted to "hear the tapes" that would be produced in discovery. *See id.* at 2202–03.

court applied an enhancement for a firearm found in that house. The court rejected Barnes's request for a downward variance, a request based in part on a comparison to his co-defendant Jomo Grady. The court sentenced Barnes to 324 months' incarceration, the low end of the Guideline range. Barnes timely appealed.

## II.

Barnes argues that the district court erred in concluding that he had not "show[n] a fair and just reason for requesting" to withdraw his plea. Fed. R. Crim. P. 11(d)(2)(B). We review that decision, as well as the court's decision not to hold an evidentiary hearing, under the abuse-of-discretion standard. *See United States v. Spencer*, 836 F.2d 236, 238 (6th Cir. 1987); *United States v. Watkins*, 815 F. App'x 22, 26 (6th Cir. 2020).

Barnes's motion is grounded in his assertion that his prior counsel was ineffective for advising him to decline the Government's Rule 11 plea offer and for failing to effectuate his desire to enter an open plea to the First Superseding Indictment. *See* Appellant Br. at 3–4. Barnes disavows any intent to exercise his right to jury trial, instead requesting that we remedy the ineffective assistance by directing the district court to permit him to plead "to the original plea offered or to plead as charged to the First Superseding Indictment." Appellant Br. at 43.

Barnes's ineffective-assistance claim is premature. In general, such claims "are best brought by a defendant in a post-conviction proceeding . . . so that the parties can develop an adequate record on the issue." *United States v. Thomas*, 74 F.3d 701, 715 (6th Cir. 1996) (citation modified). "An exception exists, however, when the record is adequately developed to allow this Court to assess the merits of the issue." *United States v. Hall*, 200 F.3d 962, 965 (6th Cir. 2000); *see also United States v. Carson*, 32 F.4th 615, 621 (6th Cir. 2022) (holding that an evidentiary

hearing produced an adequate record to permit consideration of an ineffective-assistance claim in the context of a motion to withdraw).

Here, the record is not so developed. Although Barnes's briefs provide short summaries of the facts surrounding the earlier plea discussions, Barnes provided no affidavit, either here or in the district court, attesting to those facts. He provides little detail about the contents of the Rule 11 plea offer or about the specific, allegedly ineffective advice counsel gave him. And despite now faulting the district court for failing to hold an evidentiary hearing, Barnes did not request or mention such a hearing in his motion to withdraw except to indicate counsel's "belie[f] that [Barnes] would testify" to the facts represented in the brief, which were derived "from conversations between current counsel and Mr. Barnes" "in the event the Court orders an evidentiary hearing on this motion." R. 486, Mot. to Withdraw, PageID 2301. The district court did not abuse its discretion in declining to order a hearing to cash Barnes's promissory note for testimony he was unwilling or unable to place in a sworn affidavit or even proffer in any detail.

Setting aside the ineffective-assistance claim, Barnes offers little to suggest that the district court abused its discretion by refusing his request to withdraw his plea. The rule regarding the withdrawal of guilty pleas is designed "to allow a hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty." *United States v. Goddard*, 638 F.3d 490, 493–94 (6th Cir. 2011) (citation modified). We typically structure our analysis of plea-withdrawal claims around seven non-exhaustive factors. Those include:

> (1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the

defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted.

*Id.* (citation omitted).

As the district court explained, those factors weigh decisively against Barnes. The district court reasonably determined that the 179-day delay between his plea and his motion to withdraw, apparently triggered by the unfavorable presentence report, weighed heavily against his motion. We often uphold denials of motions to withdraw when fewer than six months separated the entry of the plea and the motion. *See United States v. Ellis*, 470 F.3d 275, 281 (6th Cir. 2006) (collecting cases). Barnes's failure to assert actual innocence, his college education, his familiarity with the criminal-justice system, and the extensive, patient explanations he received from the district court during his plea colloquy all buttress this conclusion. In all, the district court did not abuse its discretion in concluding that Barnes did not show a "fair and just reason" to withdraw his plea.

III.

Barnes next argues that his sentence was procedurally unreasonable. Procedural reasonableness requires the court to "properly calculate the guidelines range, treat the range as advisory, consider the sentencing factors in 18 U.S.C. § 3553(a), refrain from considering impermissible factors, select the sentence based on facts that are not clearly erroneous, and adequately explain why it chose the sentence." *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018). We review preserved errors under the abuse-of-discretion standard. *Id.*

*Co-Defendant Sentencing Disparity*. Barnes argued at sentencing that he ought to receive a lower sentence, one closer to the 210 months' incarceration imposed on co-defendant Jomo Grady. Emphasizing what he considered Grady's similar behavior, Barnes's sentencing memorandum argued that his sentence should resemble Grady's. But he didn't get far into this

argument at the sentencing hearing before the district court interrupted him. Explaining that it had "sentenced Mr. Grady," and "kn[e]w the[] PSRs" and "offense levels" of both defendants, the district court concluded that "[t]hey're different." R. 539, Sentencing Tr., PageID 2977. The court then asked Barnes's counsel "to talk about [his] client" instead. *Id.* Barnes's attorney repeated his request that, given the "disparity," the court "look at Mr. Grady's sentence." *Id.* Counsel then moved on.

Later, the Government offered its view of the factors "that distinguish . . . Mr. Barnes from Mr. Grady." *Id.* at 2988. For example, "in Mr. Grady's case there was no obstruction [enhancement], there was no gun enhancement, [and] there was no premises enhancement," all of which were present in Barnes's case. *Id.*

Barnes now argues that the district court failed to address his disparity argument. We disagree. Although disparities among co-defendants are not the object of 18 U.S.C. § 3553(a)(6)'s command to "avoid unwarranted sentence disparities," a court may "consider th[at] disparity" when fashioning a sentence in "his or her discretion." *United States v. Wallace*, 597 F.3d 794, 803 (6th Cir. 2010) (discussing *United States v. Simmons*, 501 F.3d 602, 624 (6th Cir. 2007)). Even if a court declines to exercise that discretion, the record must reflect that the district court considered a defendant's non-frivolous argument in this regard. *Id.*

Here, the district court did so. The court initially indicated that it had "sentenced Mr. Grady," that it "kn[e]w the[] PSRs" of both defendants, "kn[e]w their offense levels," and had concluded that the two individuals were "different." R. 539, Sentencing Tr., PageID 2977. And when it came time to impose sentence, the court returned to the disparity argument. It first noted that it had "been very carefully paying attention to who's involved in this drug trafficking organization, what they've done, where I've sentenced them, what factors they've had, . . . where

they have fallen." *Id.* at 2996. It had even kept track of the sentences other judges in the district had imposed on Barnes's co-conspirators. And with respect to the particular request that the court "consider [the] Grady sentence," the court indicated that it "did at 210 [months' incarceration]. He had different factors going on." *Id.* at 2997.

This record, while brief, is sufficient to show that the court considered Barnes's disparity argument. Although "the judge might have said more," where "the record makes clear that the sentencing judge considered the evidence and arguments," the law does not "require[] the judge to write [or speak] more extensively." *Rita v. United States*, 551 U.S. 338, 359 (2007). Barnes argues to the contrary, pointing to *Wallace* and *United States v. Guerrero*, 2024 WL 3427204 (6th Cir. 2024), for support. But this case is not like *Wallace*, where a judge "was completely non-responsive to th[e] argument," "not mak[ing] even a cursory mention of the disparity in sentences." 597 F.3d at 803–04. Nor is it like *Guerrero*, where the "district court did not acknowledge [the] argument in the slightest." 2024 WL 3427204 at *10. Accordingly, the district court did not err.

*Dangerous Weapon Enhancement*. Next, Barnes argues that the district court erred in applying a two-point enhancement under U.S.S.G. § 2D1.1(b)(1) for possessing a dangerous weapon. The enhancement applies where the Government establishes that "(1) the defendant actually or constructively possessed the weapon, and (2) the weapon was possessed during relevant conduct to the offense." *United States v. Brown*, 131 F.4th 337, 344 (6th Cir. 2025) (citation modified). Once those first two prongs have been met, "the burden shifts to the defendant to show that it was clearly improbable that the weapon was connected to the offense." *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007) (citation modified). When "the government attempts to apply this enhancement based on the conduct of a co-conspirator," it "must establish that the

dangerous weapon possession was within the scope of the jointly undertaken criminal activity; in furtherance of that criminal activity; and reasonably foreseeable in connection with that criminal activity." *Brown*, 131 F.4th at 344. A district court's finding on the first question, possession, is reviewed under the clear-error standard. *Id.* We review de novo whether the "weapon was possessed during relevant conduct." *Id.* (citation modified). "But when the relevant conduct determination depends on co-conspirator liability (like in this case), factual findings about the conspiracy are reviewed for clear error." *Id.*

Barnes argues that the district court erred in concluding that he could be held responsible for a gun found in a home on Braile Street, which Barnes owned jointly with his mother. Before confronting this argument, however, the Government urges us to affirm on the ground that Barnes failed to challenge his possession of a second gun found at his home on Sandalwood Drive, where cash deliveries were made. The Government argues that the district court found Barnes's possession of either gun to be sufficient to warrant the enhancement. We are persuaded, however, by Barnes's reading of the sentencing record. As we read the record, the district court discussed the Sandalwood firearm as "supportive evidence that [Barnes was] aware" of the presence of firearms in the conspiracy and that it was "reasonably foreseeable that his cohort, Mr. Williams," who actually possessed the firearm found at the Braile Street residence, "also ha[d] a gun." R. 539, Sentencing Tr., PageID 2902. This reading is bolstered by the fact that both the PSR and the Government's sentencing memorandum urged application of the enhancement on the basis of the Braile Street firearm alone. Accordingly, we will consider only the Braile Street gun in reviewing whether the enhancement was proper.

Nonetheless, Barnes's challenge fails. Barnes was the co-owner of the Braile Street house and ran his branch of a drug-trafficking organization out of that location. Accordingly, Barnes's

"dominion over the premises where the item is located" suffices to show his constructive possession of the gun. *United States v. Sanchez*, 928 F.2d 1450, 1460 (6th Cir. 1991) (*abrogated on other grounds by United States v. Jackson-Randolph*, 282 F.3d 369 (6th Cir. 2002)) (citation modified). The loaded handgun was recovered from a kitchen drawer; cocaine was also found in the kitchen. The presence of a firearm can further a conspiracy by acting as "protection" for those dealing in large quantities of drugs. *Brown*, 131 F.4th at 345 (citation modified). And we have held that "such possession is foreseeable when there are massive amounts of drugs in a single location," including as little as "20,000 dollars' worth of cocaine." *Id.* (citation modified) (collecting cases). Here, police intercepted two kilograms of cocaine, purchased for $65,000, which were taken by car from the Braile Street house one week before police found the firearm loaded in a kitchen drawer beneath a cabinet in which cocaine was stored. We see no clear error in the district court's finding that the firearm was possessed during conduct relevant to the conspiracy and that its possession was reasonably foreseeable to Barnes.

*Obstruction Enhancement*. Barnes argues that the district court erred in applying a two-point enhancement under U.S.S.G. § 3C1.1 for obstruction of justice. The enhancement applies where "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" and this "obstructive conduct related to" "the defendant's offense of conviction and any relevant conduct" or "a closely related offense." U.S.S.G. § 3C1.1. Per the Guidelines commentary, a defendant is responsible for his "own conduct" and others' conduct he "aided or abetted, counseled, commanded, induced, procured, or willfully caused." *Id.* cmt. n.9. When reviewing the application of this Guideline, we review the district court's findings of historical fact under the clear-error standard. *United States v. Thomas*, 933 F.3d 605, 608 (6th Cir.

2019). We review pure questions of law de novo. *Id.* We have sent "mixed messages on the standard of review" applicable to a district court's application of law to fact under this Guideline, *id.*, though we recently concluded that, at least for obstruction enhancements based on perjury, the clear-error standard applies, *see United States v. Jackson*, 154 F.4th 422, 427–28 (6th Cir. 2025). We need not decide whether *Jackson*'s holding extends to non-perjury-based enhancements as well. Even applying de novo review on the application of law to fact, Barnes's claim fails.

The district court applied the obstruction enhancement on the basis of two actions. First, it concluded that Barnes attempted to sell the Braile Street house to frustrate the Government's efforts at forfeiture. On July 6, 2023, the same day that police executed a search warrant at the Braile Street house, Barnes put the property up for sale at $115,000, payable in cash or by conventional financing. He later relisted the house for $145,000 in September; two days after the indictment was unsealed, he dropped that price to $80,000 "cash only." R. 539, Sentencing Tr., PageID 2910; *see also* R. 518, Gov't Sentencing Mem., PageID 2588 (containing screenshot of Zillow listing). Because he co-owned the house with his mother, Barnes drove to Michigan on September 25 to personally sign over his power of attorney. This was more than a week after the indictment was unsealed, but more than two weeks before he would turn himself in to the police. Second, the district court noted Barnes's decision to deposit his jewelry with a jeweler in Los Angeles after the unsealing of the indictment and before leaving for Michigan, a practice that was "out of the ordinary," that generated no documentation, and that allowed co-conspirators to retrieve jewelry to purchase drugs. R. 539, Sentencing Tr., PageID 2918–19, 2970. In all, the district court concluded, Barnes was "clearly trying to hide assets so that they [would] not [be] subject to forfeiture" and "it's not hard to conclude that Mr. Barnes obstructed justice." *Id.* at 2970.

Barnes now argues that this evidence was insufficient to show that he acted with the intent to skirt forfeiture. Questions of intent—that is, judgments as to "why" someone took an action—are matters of "historical fact finding" reviewed under the clear-error standard. *Thomas*, 933 F.3d at 608. Barnes has not come close to overcoming this high bar. On the timing of the sale, he argues that the initial listing of the Braile Street house, before the unsealing of the first indictment, demonstrates his good faith. But that first listing came a week after police intercepted two kilograms of cocaine being transported from the house, and the same day a search warrant was executed. Similarly, the fact that Barnes co-owned the house with his mother does not distance him from the sale. Barnes traveled from California to Michigan to execute the power of attorney in person, knowing that he was under indictment. He later lied about the purpose of his travel, claiming it was only to "turn [him]self in," when, in fact, he tarried in Michigan for two and a half weeks before doing so. *See* R. 483, Plea Hr'g Tr., PageID 2200. The district court did not err in applying the obstruction enhancement.

*Drug Weight*. Finally, Barnes argues that the district court erred in finding that he was responsible for trafficking between 15 and 50 kilograms of cocaine. The drug weight determination "is a factual finding that we review for clear error." *United States v. Russell*, 595 F.3d 633, 646 (6th Cir. 2010). Barnes argues that the district court erred by concluding: (1) that text-message references to single-digit integer quantities of cocaine denoted kilograms and not ounces, (2) that the seizure of six kilograms of cocaine from his co-defendant, Ivan Williams, could be attributed to Barnes, and (3) that the value of the jewelry could contribute to the estimated total drug weight. But, as the district court rightly concluded, neither the cocaine seized from Williams, nor the value of the jewelry is necessary to reach 15 kilograms. So we decline to address either of these arguments.

With respect to Barnes's remaining argument, he contends that the district court clearly erred by interpreting text messages and conversations between him and his co-conspirators as referring to kilogram quantities of drugs rather than ounces. For example, in one text Barnes instructed Williams to "save one for R.J."; in another, Williams told Barnes that "Sweets wants to purchase four." R. 539, Sentencing Tr., PageID 2892.

The district court carefully walked through each call and message and concluded that the quantity referred to should be measured in kilograms, not ounces. The court then concluded that the amounts totaled 18 kilograms. As for why the conversations referenced kilograms and not ounces, the court credited the testimony of the Government's expert, Agent Falletich, who interpreted the discussions as relating to kilograms. The court also noted that Barnes's recorded discussion of a $24,500 drug debt owed to his co-defendant was an amount "consistent with kilo level transactions." *Id.* So was the amount of "insurance" (a Rolex) that Barnes's girlfriend offered in a recorded call as collateral for "two little pieces." *Id.* at 2893. And, as the district court explained, investigators had intercepted two and then six kilograms of cocaine after conversations referring to quantities of "two" and "six." *Id.* at 2891. That supports the inference that the relevant quantities of cocaine referenced in all of Barnes's text messages and phone calls were measured in kilograms. Add it all up, and the district court didn't clearly err in calculating the drug weight.

\* \* \*

We AFFIRM.