RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0087p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LESTER SADLER (12-4450) and NANCY SADLER (12-4458),

*Defendants-Appellants.*

Nos. 12-4450/4458

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati
No. 1:10-cr-00098-1—Sandra S. Beckwith, District Judge.

Argued: March 13, 2014

Decided and Filed: April 24, 2014

Before: DAUGHTREY, SUTTON and DONALD, Circuit Judges.

_____

COUNSEL

**ARGUED:** Robert Dietrick, DUANE MORRIS LLP, Washington, D.C., for Appellant in 12-4450. William G. Brown, THE PICKRELL LAW GROUP, P.C., Nashville, Tennessee, for Appellant in 12-4458. Timothy S. Mangan, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Robert Dietrick, DUANE MORRIS LLP, Washington, D.C., for Appellant in 12-4450. William G. Brown, THE PICKRELL LAW GROUP, P.C., Nashville, Tennessee, for Appellant in 12-4458. Dale Ann Goldberg, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee.

1

_____

**OPINION**

_____

SUTTON, Circuit Judge.  A jury convicted Lester and Nancy Sadler, husband and wife, of various crimes associated with the operation of several pain-management clinics in central and southern Ohio.  They each appeal their convictions, and Nancy challenges her sentence as well. We affirm on all grounds save one:  Nancy's conviction for wire fraud.

I.

In 2001, Nancy and Lester opened a pain-management clinic, "First Care," in Garrison, Kentucky.  Nancy was the owner, but employees at the clinic considered both Nancy and Lester to be "in charge."  R. 205 at 8–9.  The clinic closed after the Drug Enforcement Agency investigated it and confiscated the license of the clinic's doctor for overprescribing narcotics.

In 2002, they moved the clinic to Waverly, Ohio.  In 2004, the Sadlers renamed the clinic "Ohio Medical and Pain Management."  Sometime after February 2008, Ohio Medical opened a second office in Columbus, Ohio.  Unlike at the previous clinics, Lester (not Nancy) was Ohio Medical's owner and statutory agent.

The evidence introduced at trial showed that these were not conventional pain clinics.  At the Waverly clinic, patients would arrive well before it opened, filling the clinic's parking lot and the lots of nearby businesses.  While waiting for the clinic to open, the patients used drugs and traded prescription forms for cash in the parking lots.  The patients often traveled long distances (and in large groups) to come to the Sadlers' shops, sometimes as much as 316 miles in a roundtrip, even though most of the patients lived much closer to other clinics.

Matters did not improve once the patients entered the Sadlers' clinics.  After paying their $150 appointment fee (cash only), they met an "assessor" who would review the patients' health-facts "day sheet" and hand the patients an already completed prescription form.  Clinic staff sometimes filled out these day sheets and prescription forms weeks in advance, pulling the content from the patients' last day sheet and prescription and altering them slightly to make sure they didn't look the same.  Patients then stepped into an office, where they met the doctor for a

minute or two.    After that, they left the clinic (some "almost skipping," reported one witness, R. 325 at 81) with a signed prescription for a fresh supply of hydrocodone, oxycodone or other pain medications in hand.  As many as 100 people per day completed this "five minute[]" process of assessment and prescription, R. 317 at 69, a tall order, the evidence showed, for a clinic committed to practicing medicine responsibly.

The clinics also treated phantom patients.  Each month, Nancy would announce to the clinic staff that "it was time to do the charts," meaning it was time to update the medical treatment files for a long list of people who had never set foot in the clinics.  R. 326 at 35.  The Sadlers used the names of family members for these charts.  Lester's dad had a chart, as did two of the Sadlers' children, Kyle and Levi, though none of them ever needed the clinics' services. Staff members would then write prescriptions for these non-existent patients, the doctor would sign the prescriptions, and clinic staff would fill the prescriptions at a local pharmacy.  The pain pills found their way to David Michael Journey, a relative of the Sadlers and an occasional clinic employee, who sold the pills on the street at a significant profit.

The Sadlers' real and make-believe patients generated a remarkable number of pill prescriptions.  Dr. Brenda Banks, a doctor hired by the Sadlers to work at Ohio Medical, was the state's number one prescriber of hydrocodone in 2006 and 2007.  And by a wide margin:  In 2006, she prescribed 147,000 dosage units of the drug, almost 107,000 more units than Ohio's next most prolific prescriber.  In 2007, Dr. Banks prescribed 62,400 dosage units, while the second-place prescriber doled out 19,650.

Nor did the clinics limit themselves to pain prescriptions.  The clinics also ordered hydrocodone and other drugs directly from pharmaceutical companies.  None of the clinics, however, ever obtained a license to dispense controlled substances.  *See* R. 316 at 10, 25–26 (The clinics never obtained "a terminal distributor license.")  To get around that problem, Nancy would order the drugs by using the clinic doctor's DEA registration number, Lester would pay for the drugs, and the drugs would arrive at the clinic.  Two witnesses described where the pills went next.  One said that she saw Nancy take a handful of pills to Dr. Banks, who apparently was addicted to consuming as well as distributing painkillers.  Another said that he sold some of these pills to addicts outside of the clinic and split the proceeds with Nancy.

A grand jury charged Lester and Nancy with several crimes, including conspiring to distribute controlled substances illegally, maintaining a premises for distributing the substances, and distributing drugs to phantom patients.  It also charged Nancy with wire fraud and money laundering.  After a fourteen-day trial, the jury found Lester and Nancy guilty of the conspiracy and maintaining-a-premises charges, Nancy guilty of wire fraud and money laundering, and the couple not guilty of the individual distribution charges.  The district court sentenced Lester to 151 months and Nancy to 210 months.

## II.

The Sadlers argue that the government produced insufficient evidence to convict them on several charges.  When reviewing sufficiency-of-the-evidence claims, it (almost) goes without saying that we "view [the evidence] . . . in the light most favorable to the government," *United States v. Arnold*, 486 F.3d 177, 180 (6th Cir. 2007) (en banc) (internal quotation marks omitted), asking whether "any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

*Wire fraud.*  Nancy challenges the sufficiency of the evidence supporting her wire fraud conviction.  The statute prohibits individuals from using interstate communications to carry out "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1343.  While on a first reading one might think the statute contains two distinct crimes—a "scheme to defraud" *or* a "scheme . . . for obtaining money or property"—that is not the case.  *See Cleveland v. United States*, 531 U.S. 12, 25–26 (2000); *McNally v. United States*, 483 U.S. 350, 357–59 (1987).  The statute instead punishes one kind of scheme—schemes intended "to deprive [people] of their money or property." *Cleveland*, 531 U.S. at 19 (internal quotation marks omitted).  In this instance, that meant the government had to prove Nancy knowingly used an interstate wire communication to further a scheme to defraud the distributors of their money or property.  *See United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010).

To these ends, the government showed that Nancy lied to pharmaceutical distributors when she ordered pills for the clinic by using a fake name on her drug orders and by falsely telling the distributors that the drugs were being used to serve "indigent" patients.  R. 320 at 96–

97.   The government also proved that she used faxes, phone calls and other interstate wire communications to facilitate her purchases.   Through it all, however, the government never showed that Nancy intended to deprive anyone of property.   All that the evidence shows is that Nancy paid full price for all the drugs she purchased and did so on time.   How, then, did Nancy deprive the distributors of property?

The government's opening bid offers this answer:   Nancy deprived the distributors of their pills.   Well, yes, in one sense:   The pills were gone after the transaction.   But paying the going rate for a product does not square with the conventional understanding of "deprive." *Cleveland*, 531 U.S. at 19; Webster's Third New International Dictionary 606 (2002).   Stealing the pills would be one thing; paying full price for them is another.   Case law reinforces that the conventional meaning of "deprive" applies in the fraud context.   To be guilty of fraud, an offender's "purpose must be to injure," *Horman v. United States*, 116 F. 350, 352 (6th Cir. 1902), a common-law root of the federal fraud statutes, *see Neder v. United States*, 527 U.S. 1, 21–25 (1999); Restatement (Second) of Torts § 531 ("One who makes a fraudulent misrepresentation is subject to liability . . . for pecuniary losses suffered.").   Nancy may have had many unflattering motives in mind in buying the pills, but unfairly depriving the distributors of their property was not one of them. As to the wire-fraud count, she ordered pills and paid the distributors' asking price, nothing more.

As an alternative, the government offers another potential deprivation:   Nancy's lies convinced the distributors to sell controlled substances that they would not have sold had they known the truth.   Nancy in other words deprived the companies of what might be called a right to accurate information before selling the pills.   To support this theory, the government points to the testimony of one distributor's representative, who said she would have been "concern[ed]" had she known more about Nancy's operation.   R. 320 at 58.   But the statute is "limited in scope to the protection of *property rights*," and the ethereal right to accurate information doesn't fit that description.   *McNally*, 483 U.S. at 360 (emphasis added).   Nor can it plausibly be said that the right to accurate information amounts to an interest that "has long been recognized as property." *Cleveland*, 531 U.S. at 23 (internal quotation marks omitted).

*United States v. Murphy* illustrates the point.  836 F.2d 248, 253–54 (6th Cir. 1988).  The government charged the defendant with mail fraud because he lied on his application for a state bingo permit.  The state argued it had a "right to control" the permits and a "right to accurate information" regarding their issuance.  True or not, these were not the kind of "property" rights safeguarded by the fraud statutes, we held.  *Id.* at 254.  Just the same here:  Until the government proves that Nancy intended to deprive the distributors of "money" or "property," it must look elsewhere for a conviction.

Even when Congress amended the fraud statutes to cover *some* intangible rights, it did not stretch the statute to cover the right to accurate information before making an otherwise fair exchange.  Before 1987, "numerous [courts had] interpreted the [fraud] statute broadly [to] affirm[] convictions involving schemes to defraud" victims of all kinds of intangible rights, including a right to privacy and honest elections.  *Id.* at 250.  The Supreme Court stopped this expanding universe of intangible-right protections, limiting the fraud statutes' scope to rights that sounded in property.  *See Carpenter*, 484 U.S. at 25; *McNally*, 483 U.S. at 360.  Congress responded to *Carpenter* and *McNally* in 1988, but its response was limited.  Instead of reinstating the universe of previously protected intangible rights, it embraced just one of them:  "the intangible right of honest services," which protects citizens from public-official corruption.  18 U.S.C. § 1346.  Congress's reverberating silence about other intangible interests tells us all we need to know.  Nancy's fabrications, objectionable though they may be and punishable under other laws though they may be, fall outside this statute.

This congressional silence counts against the government's theory for other reasons as well.  Lightly equating deceptions with property deprivation, even when the full sales price is paid, would occupy a field of criminal jurisdiction long covered by the States, a consideration that has prompted the Court to resist like-minded readings of "scheme to defraud" before.  The government prosecuted Carl Cleveland and others under the mail-fraud statute (with materially identical language to the wire-fraud statute) for making false statements in the course of applying for licenses to operate video poker machines.  *Cleveland*, 531 U.S. at 15.  In rejecting the government's theory, the Court held that this interpretation of the statute would "invite[] us to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement

by Congress." *Id.* at 24. The same goes for this case: Finding a property deprivation based on Nancy's lies "would subject to federal [wire] fraud prosecution a wide range of conduct traditionally regulated by state and local authorities." *Id.* Ohio already regulates the use of "deception" to "procure . . . the dispensing of[] a dangerous drug." Ohio Rev. Code § 2925.22(A). And the State's definitions of "deception," "dispense" and "dangerous drug" easily capture Nancy's pill-buying behavior. *Id.* at §§ 2913.01(A), 3719.01(E), 4729.01(F). "[U]nless Congress conveys its purpose clearly," we cannot—indeed the Court tells us we should not—upset the "federal–state balance in the prosecution of crimes" to hold Nancy accountable for these misdeeds. *Jones v. United States*, 529 U.S. 848, 858 (2000) (internal quotation marks omitted).

That silence also requires us to pick the more lenient reading of the wire-fraud law. "[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *McNally*, 483 U.S. at 359–60. "Money," "property" and "the intangible right of honest services" clearly and definitely fall within the fraud statutes' scope, 18 U.S.C. §§ 1343, 1346, but other interests—such as the right to accurate information—do not. Without more, we must conclude that the distributors' truth-in-purchasing concerns do not support a federal criminal conviction.

*Maintaining a drug premises.* Both Nancy and Lester challenge their convictions for maintaining a drug-involved premises. *See* 21 U.S.C. § 856(a)(1). To support this charge, the government had to show that the couple knowingly maintained their clinics for the purpose of distributing a controlled substance. *See United States v. Russell*, 595 F.3d 633, 644 (6th Cir. 2010). What counts as "maintenance"—"control, duration, acquisition of the site, renting or furnishing the site, repairing the site, [and] supervising," *id.*—fits the Sadlers' job activities to the letter. Lester owned Ohio Medical, he had been involved in the management of pain clinics since at least 2001, he signed Ohio Medical's lease and rent checks, he was the office repairman, and he was considered the boss of the clinic by the employees. Nancy meanwhile owned and managed various incarnations of the clinics, and the lessees of the clinic properties considered Nancy a point of contact for complaints, payments and other issues. More, the purpose of the clinics was to distribute drugs, including through illegal drug purchases from distributors,

assembly-line distribution of pain-medication prescriptions, and distribution of controlled substances to individuals without proper prescriptions.

For her part, Nancy counters that the government failed to show that she maintained the clinics "*for the purpose of . . .* distributing . . . any controlled substance," 21 U.S.C. § 856(a)(1) (emphasis added), because the "drug-related purpose . . . [was not a] *significant or important*" part of the clinics' operation, *Russell*, 595 F.3d at 643 (internal quotation marks omitted) (emphasis added).  As Nancy tells it, distributing drugs was a minor side business, a theory partly corroborated by the jury's decision to acquit her of the individual drug distribution charges.  But this argument reads too much into the verdict.  The jury acquitted Nancy of distribution charges related to *two* individuals, but the jury convicted her on the general conspiracy count, based on evidence about her involvement in the distribution of pain narcotics to many others.  Nancy placed her first illegal, unlicensed order for a controlled substance in 2003.  These orders continued until 2007, when the drug distributors became suspicious and stopped shipping pills to the clinic.  In the interim, Nancy ordered 216,620 dosage units of controlled substances, which found their way into the pockets of doctors, patients and addicts on the street.  Drug distribution need not be the *primary* purpose of a premises, so long as it is a "significant" one. *See Russell*, 595 F.3d at 642; *see also United States v. Johnson*, 737 F.3d 444, 447–48 (6th Cir. 2013).  A rational trier of fact could conclude that Nancy's clinics met this requirement.

For his part, Lester argues that his presence at the clinics "did not endow knowledge or intent upon him."  Lester Reply Br. at 14.  But as shown he was not merely hanging out biding his time at the clinics.  He set daily patient quotas, paid the clinics' drug bills, fielded complaints from neighbors about the unsavory character of the clinics' patients, and the like.  And he continued to do all of this *after* learning that the DEA was investigating the clinics.  Plenty of evidence supported his conviction.

*Conspiracy.*  Lester claims that the government produced insufficient evidence to convict him of conspiring to distribute pain pills.  To sustain the conspiracy charge, the government had to prove an agreement to violate the drug laws, that Lester knowingly joined the conspiracy, and that he participated in it. *See United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007).

Ample evidence supported this charge. As for the agreement, Lester owned and operated several pain-management clinics with Nancy. As for knowledge, he continued to operate Ohio Medical's two branches *after* previous clinics had been shut down and *after* the DEA searched his home and office in 2008. As for participation, he supported the conspiracy in several ways: paying bills, handing out paychecks to clinic employees, hiring doctors, and shuffling pre-completed day sheets and other documents between the clinics and his home office.

Lester claims that these were all "innocent" tasks and that there was no "direct evidence" connecting him to the drug operation. But this is factually incorrect and legally irrelevant to boot. Factually: Lester paid the distributors' bills for hydrocodone and other controlled substances, meaning he was directly involved in the delivery and distribution of drugs that the clinics were *not* licensed to distribute; and multiple witnesses testified that Lester set a treatment "quota" of at least forty patients per day even though the evidence showed that seeing twenty to twenty-five patients is a difficult task. R. 217 at 51. A jury could rationally think that this was not innocent behavior. Legally: The government had no obligation to produce "direct evidence" against Lester, as "guilty knowledge and *voluntary participation* may be inferred from surrounding circumstances." *United States v. Hodges*, 935 F.2d 766, 773 (6th Cir. 1991) (internal quotation marks omitted). Those circumstances all pointed in one direction—that this pain-treatment operation was a charade, and Lester played a critical part in facilitating the charade.

III.

Nancy challenges her 210-month prison sentence on procedural and substantive reasonableness grounds.

*Drug quantity.* She challenges the amount of drugs that the district court attributed to her conduct, a number that helps to set the base offense level for the guidelines range. *See* U.S.S.G. § 2D1.1(a)(5), (c). So long as a preponderance of the evidence supports the district court's finding, an estimate will do. *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008); *see also* U.S.S.G. § 2D1.1 n.5. The district court found Nancy responsible for more than 1,900 grams of hydrocodone and 85 grams of oxycodone, a determination we will second-guess only if the court clearly erred. *Jeross*, 521 F.3d at 570.

To calculate Nancy's base offense, the court aggregated the drug quantities from three sources: the hydrocodone Nancy ordered directly from drug distributors; the pain medication prescribed to phantom patients (members of her family); and the oxycodone prescribed to Erin Baldridge, a known drug addict. Considerable evidence supports each measurement as well as Nancy's role in the illegal activity.

Counting drugs prescribed to her family members was improper, Nancy argues, because she was acquitted of the individual counts of drug distribution to two other patients. Contrary to her intimation, the district court did not rely on acquitted conduct. The jury found Nancy not guilty of distribution charges regarding two phantom patients (James and Jackie Journey), but the jury said nothing about other, uncharged phantoms (such as family members James and Kyle Sadler and Sharon Crowder). Lots of evidence established these other transactions, and Nancy does not argue otherwise.

Nancy adds that Erin Baldridge's prescriptions should not have been added to the mix because she "lied to assessors and doctors in order to receive prescriptions" and it would be unreasonable to sentence her based on "the conduct of other clinic employees." Nancy Br. at 33, 35. That Baldridge lied to get pills cuts against Nancy. Baldridge's story illustrated how the Sadlers' scheme worked: A "dope sick" drug addict could walk into Nancy's clinic, hand over some cash, get no "real pain assessment," tell an obvious lie, and walk (or skip) out of the clinic minutes later with a drug prescription in her pocket. R. 312 at 13–19. That Dr. Banks and other conspirators wrote these prescriptions does not absolve Nancy of responsibility. "Where there exists 'jointly undertaken criminal activity,' the base offense level is determined not only by acts committed by the defendant but also 'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'" *United States v. Wilson*, 168 F.3d 916, 922 (6th Cir. 1999) (quoting U.S.S.G. § 1B1.3(a)(1)(B)).

*Leadership-role enhancement.* Section 3B1.1(a) of the Sentencing Guidelines calls for a four-point enhancement when the defendant "was an organizer or leader of a criminal activity that involved five or more participants." Plenty of evidence supports the district court's finding that Nancy was a leader. The conspiracy involved at least five participants. Everyone involved in the conspiracy considered Nancy the pain clinics' "boss." And she acted the part by opening

the clinics, managing day-to-day operations, hiring employees, encouraging employees to see more and more patients, requiring employees to produce fake medical files for phantom patients, ordering pills she had no business ordering, and splitting profits from street sales of the pills. Such acts of decision making, recruitment and profit taking are the hallmarks of an "organizer or leader." *See* U.S.S.G. 3B1.1 n.4.

Instead of disclaiming the propriety of any such enhancement, she argues that four points were too much. She was, she says, at most a "manager or supervisor," deserving only a three-point enhancement because *other* conspirators—including Dr. Banks and David Michael Journey—were the ringleaders. As the guidelines tell us, however, "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal . . . conspiracy." *Id.* Although her husband, her doctors and her relatives all played important roles in the operation, that does not exonerate her from a sentencing enhancement premised on *her* leadership actions.

*Probation enhancement.* The guidelines also direct courts to add two points to a defendant's criminal history score "if the defendant committed the instant offense while under any criminal justice sentence, including probation." U.S.S.G. § 4A1.1(d). The district court found that Nancy's offense overlapped with her probation period for a previous crime, a decision that must stand unless clearly wrong. *Wilson*, 168 F.3d at 922–23.

No error, clear or otherwise, occurred. Nancy pled guilty to wire fraud in 2003 in connection with activities at another pain-management clinic. The punishment for this offense kept Nancy on probation until July 2005, a date well after several of Nancy's drug-conspiracy acts. She opened the Ohio Medical clinic in 2004, and that year she also ordered large amounts of hydrocodone from drug distributors, despite the fact that Ohio Medical was not licensed to keep or dispense the drugs. That means Nancy committed "the instant offense"—here, conspiracy—"while under . . . probation."

To all of this, she rejoins that the only evidence of criminal conduct presented at trial concerned her sale of pills to David Michael Journey in 2006. But this argument fails to come to grips with the scope of her conspiracy conviction and the § 4A1.1(d) enhancement. The two-point increase applies "if the defendant committed *any part* of the instant offense (i.e., *any relevant conduct*) while under . . . probation." U.S.S.G. § 4A1.1(d) n.4 (emphasis added). As

shown, plenty of "relevant" probationary-period conduct exists: She opened a clinic that offered patients assembly-line "treatment," and she bought pills illegally.

*Substantive reasonableness.* A sentence should not be "greater than necessary to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a)." *United States v. Tristan-Madrigal*, 601 F.3d 629, 632–33 (6th Cir. 2010). The district court imposed a sentence within Nancy's recommended guidelines range, meaning the sentence comes with a rebuttable presumption of reasonableness. *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (en banc).

Nancy argues that her sentence is more onerous than it ought to be because the court considered "unrelated criminal enterprise[s]" when choosing her sentence. Nancy Br. at 51–52. But she is mistaken. At Nancy's sentencing hearing, a government lawyer noted that the Sadlers' clinics were, like other pill mills, "well-known" among local addicts. R. 334 at 48. Nothing in the record suggests that the district court paid this offhand comparison to other clinics any heed. The court instead considered the nature and circumstances of *Nancy's* offense, including the fact that her clinic "was a primary source for illegal distribution of pain medication in Southern Ohio, [an] area . . . saddled with high rates of prescription drug abuse and addiction." *Id.* at 58. No error was shown.

IV.

For these reasons, we affirm in part, vacate in part and remand for proceedings consistent with this opinion.