NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0557n.06

Case No. 15-5668

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Oct 03, 2016

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE MIDDLE DISTRICT OF |
| L. BRIAN WHITFIELD, | ) | TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: ROGERS, SUTTON, and COOK, Circuit Judges.

SUTTON, Circuit Judge. Brian Whitfield owned and managed a human resources and payroll processing company called the Sommet Group. After the government determined that he used his position to steal $25 million from his customers and the government, a jury convicted him of multiple acts of wire fraud, ERISA plan embezzlement, IRS fraud, and money laundering. On appeal, Whitfield challenges the sufficiency of the evidence supporting these convictions, the admissibility of certain evidence used at trial, and the final calculation of his sentence. We affirm on all counts.

I.

Viewed in the light most favorable to the government, the evidence at trial showed the following. In the fall of 2003, Whitfield and his (then) father-in-law, Ed Todd, co-founded the Sommet Group—or the Personnel Department, as it was then known. Whitfield held a 51%

stake in the company and Ed, the primary sales manager, held a 49% stake. Marsha Todd (then Marsha Whitfield, Brian's wife and Ed's daughter) ran the payroll department.

The company offered payroll processing and human resource services to small and medium-sized companies. The idea was to give smaller companies "the benefit of [its] expertise, [] infrastructure, and economies of scale," while also providing freedom from "the overhead of a back office." R. 213 at 31. It worked. For a while.

Most clients allowed Sommet to transfer funds directly from their bank accounts into Sommet's operational account in an amount necessary to cover the client's payroll, tax, and benefit obligations. Drawing from this operational account, Sommet would allocate the client's funds to the appropriate destinations: the IRS, state taxing authorities, various benefits programs (workers compensation, health insurance, and 401(k) plans), and the client's employees. Sommet also collected and maintained the tax withholdings for individual employees, agreeing to remit these funds to state and federal authorities as they came due. In exchange for its services, Sommet charged an administrative fee based on a percentage of the client's overall payroll (usually around 3%), which it transferred as part of the regular payroll withdrawals.

Each quarter, the IRS required Sommet to file a federal tax return called a 941 form. Sommet reported its wages, employee withholdings, and Social Security and Medicare taxes on these forms. To streamline the tax-filing process, Sommet claimed most of its clients' employees as its own. That meant Sommet would include its clients' employees under its own tax identification number on these forms, not those of their day-to-day employers. Whitfield completed and filed these forms for the Sommet Group. While Whitfield completed the 941 forms, Paula Byrd, a payroll tax specialist, completed and filed Sommet's state taxes and employee W2 forms. As part of this work, Byrd compiled payroll information from Sommet's

internal database, "the Darwin system." *Id.* at 218–19. Because this information applied to federal and state taxes, Marsha would forward Byrd's spreadsheets to Whitfield to assist him in preparing the federal 941 forms.

For some clients, Sommet offered its services à la carte. As to these employers, Sommet would still file their tax returns but did not include any of the client's employees under Sommet's umbrella. Early success led the company to grow to more than 100 employees. The company also acquired and established a number of additional business units: an information technology company (IT Express), a telephone services company (EMG Communications), an insurance company (Sommet Risk & Insurance), and a promotional products supplier (BrandCentrik).

In 2008, Sommet began offering its own health insurance plan to clients. Sommet would draft money from its clients' accounts to collect plan premiums, holding these funds too in its operational account. Sommet then employed a third party administrator to process and pay the plan's claims, with Sommet providing the funding upon request. A company called HealthFirst filled this role as plan administrator.

In February 2009, Sommet began to fall behind on its obligations. Unfortunately for his clients, Whitfield had been using the company's operational account (where it housed client funds earmarked for employee payroll, benefits, and taxes) for a few other things, including company and affiliate expenses as well as personal disbursements. According to Marsha, Whitfield viewed the account as "his money." R. 217 at 14.

In February 2009, Wachovia informed Whitfield and Marsha that Sommet had overdrawn its account. From then on, Whitfield assumed control over the operational account. Sommet employees needed Whitfield's approval to disburse funds from the account, including funds for

client obligations (except payroll disbursements). Despite internal requests and client complaints, Whitfield often refused to authorize timely disbursements for client obligations.

In September 2009, HealthFirst, Sommet's health plan administrator, began receiving complaints from healthcare providers that Sommet's claims checks were bouncing. Sommet eventually refused to provide the funds needed to cover claims as they came due. In November 2009, HealthFirst sent a letter to Sommet insisting that it resolve these funding issues. The letter indicated that the "[d]elay in claims release ha[d] angered providers and damaged [HealthFirst's] reputation in the marketplace" and that HealthFirst had "passed the 30-day mark that require[d] [it] to notify the United States Department of Labor that a client appear[ed] to be insolvent." R. 214 at 150–51. When Sommet failed to comply, HealthFirst terminated the relationship in January 2010 and contacted the Department of Labor. At that time, Sommet's unfunded medical claims had accumulated to slightly over one million dollars.

Sommet then hired HCH to step in as plan administrator. HCH, like HealthFirst, soon encountered funding delays. After much back-and-forth and partial, but insufficient payments, HCH could not convince Sommet to cover its outstanding claims obligations, and in June of that year, it too terminated the relationship. The Department of Labor found that employees had been left with $3.8 million in unpaid claims.

In addition to its health plan woes, Sommet fell behind on its other client obligations. Whitfield began delaying payments to state and federal tax authorities, which led to late penalties and accumulated interest. Sommet's cash shortfalls eventually became so severe that it could not cover its payroll obligations.

Even as these cash flow problems swirled around Sommet, Whitfield instructed Marsha to use the company account to fund the construction of a home infinity pool, the purchase of a

three-story houseboat, and the charter of a private jet to attend a football game. Funds from this account also went to cover Sommet's internal expenses, including personal compensation, salaries for the Sommet affiliate companies, and large payments for the naming rights to a Nashville sports stadium.

Making matters worse, Whitfield's 941 forms did not match the W2s completed by Byrd. Nor did they match her internal spreadsheets. The variances were considerable. As one example, Byrd's spreadsheet listed Sommet's wages for the first quarter of 2009 as $12.4 million, while Whitfield's 941 reported only $871 thousand for that quarter. This gap grew larger in later filings.

All of this led to a federal investigation. Whitfield eventually was charged with, and convicted of, fifteen criminal counts: one count of conspiracy to commit wire fraud, theft/embezzlement from an employee benefit plan, and money laundering (18 U.S.C. § 371); three counts of wire fraud (18 U.S.C. § 1343); three counts of theft/embezzlement from an employee benefit plan (18 U.S.C. § 664); four counts of filing a false tax return (26 U.S.C. § 7206(1)); and four counts of money laundering (18 U.S.C. § 1957). The district court sentenced him to 240 months in federal prison, a sentence well below the presentence report recommendation of 1,584 months. Whitfield appealed.

II.

*Evidentiary and pre-trial rulings*. Because Whitfield was not charged with healthcare fraud, he argues that the district court erred in failing to remove the language regarding his alleged healthcare misconduct from the indictment. He likewise maintains that the court should have precluded testimony on this subject under Evidence Rule 403. We review both decisions

5

for abuse of discretion. *See United States v. Boyd*, 640 F.3d 657, 667 (6th Cir. 2011); *United States v. Emuegbunam*, 268 F.3d 377, 394 (6th Cir. 2001).

To convict Whitfield of wire fraud, the government needed to show that he engaged in a scheme to defraud, meaning a plan or course of action intended to deprive another person of property by means of false pretenses. *See* 18 U.S.C. § 1343; *United States v. Gold Unlimited, Inc.*, 177 F.3d 472 (6th Cir. 1999). Because the evidence showed that Whitfield misappropriated healthcare premiums and left the employees of his customers without the insurance they had purchased, that supported the wire-fraud and conspiracy counts. That of course was not the only evidence of fraud. But that means only that the district court could have struck the healthcare misconduct language from the indictment, not that it had to. The choice was fairly left "to the sound discretion of the district court." *United States v. Kemper*, 503 F.2d 327, 329 (6th Cir. 1974). The court did not overstep in making the choice it did.

So too of Whitfield's argument that the court should have excluded this evidence under Evidence Rule 403 as more prejudicial than probative. Whitfield has not shown that the district court abused its discretion in deciding that the prejudicial value of this probative evidence did not outweigh its usefulness as evidence of wire fraud or a conspiracy to commit wire fraud.

Whitfield separately challenges the admissibility and use of three summary charts created by IRS special agent, Ken Runkle. The charts juxtaposed the income data from Byrd's spreadsheets with the income data reported by Whitfield on Sommet's 941 forms and separately listed the numerical difference in red as "[U]nderreported [W]ages." R. 218 at 17. Whitfield says that the charts amounted to a "pedagogical device" under Evidence Rule 611(a), not an evidence summary under Evidence Rule 1006, and as such should not have been admitted.

6

To qualify under Evidence Rule 611(a), a pedagogical summary must only "organize or aid the jury's examination of testimony or documents which are themselves admitted into evidence." *Gomez v. Great Lakes Steel Div., Nat'l Steel Corp.*, 803 F.2d 250, 257 (6th Cir. 1986). To qualify under Evidence Rule 1006, an evidence summary "must fairly represent and be taken from underlying documentary proof which is too voluminous for convenient in-court examination, and [it] must be accurate and nonprejudicial." *Id.* As to both types of evidence, the district court has considerable leeway in deciding what to do. *United States v. Bray*, 139 F.3d 1104, 1111 (6th Cir. 1998). One difference between the two turns on whether the jurors can take the evidence into the deliberation room. Rule 1006 summaries can be brought into the deliberation room, while Rule 611(a) pedagogical summaries cannot be, save by mutual agreement of the parties. *United States v. Gazie*, Nos. 83-1851, 83-1852, 83-1860, 1986 WL 16498, at *7 (6th Cir. Feb. 26, 1986) (unpublished).

Even if we accept Whitfield's argument that the summaries were pedagogical, that does not show that the district court abused its discretion in permitting the government to use them. Whitfield argues the summaries were inadmissible under Evidence Rule 602 because "Runkle . . . was not involved in the creation of the *Sommet* spreadsheets." Appellant's Br. 37. However, Runkle did not need to create *spreadsheets* to be able to properly authenticate the *summaries*. The underlying spreadsheets were admitted and authenticated separately, and Whitfield has not challenged the admission of the spreadsheets. Runkle created the summaries, so he had personal knowledge about them. Thus, Whitfield's Rule 602 challenge fails.

Whitfield also challenges the accuracy of the data underlying the summaries, though not the summaries themselves. Whitfield complains that the Government never verified the accuracy of Byrd's spreadsheets, which according to Whitfield, were based on the company's

unreliable Darwin system. But that complaint actually challenges the admissibility of the spreadsheets—which Whitfield has not raised—not the admissibility of the summaries. Whitfield has presented no evidence that Runkle inaccurately transferred the spreadsheet data or the 941 forms' data onto the summaries. Thus Whitfield's challenge to the summaries' accuracy fails.

To the extent Whitfield challenges the jury's use of these exhibits during the jury's deliberations, as opposed to their use during the trial, he raised that argument on appeal for the first time in his reply brief. That is too late. The issue is forfeited. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).

III.

*Sufficiency of the evidence*. Whitfield claims the government did not introduce enough evidence to convict him on any of the fifteen counts. To succeed, Whitfield must show that, viewing the evidence in the light most favorable to the government, no "rational trier of fact could have found the essential elements of [his] crime[s] beyond a reasonable doubt." *United States v. Bourjaily*, 781 F.2d 539, 544 (6th Cir. 1986).

*Wire fraud*. To convict on this charge, the government had to show that Whitfield used interstate communications to carry out a "scheme or artifice to defraud" or to obtain "money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343; *see United States v. Sadler*, 750 F.3d 585, 590 (6th Cir. 2014). Ample evidence showed that Whitfield intended to defraud Sommet's customers and that he did so in part by putting the wired money to inappropriate uses, thus meeting all three requirements under the statute: a misrepresentation, an interstate communication, and a deprivation of property.

Whitfield falsely told his customers, both through his own statements and those of others, that their funds would be held and later allocated to the proper parties. That shows a misrepresentation. On the basis of these false assurances, Whitfield wired money across state lines from his customers' accounts into Sommet's own account. That shows an interstate wire transfer. And Whitfield withdrew or authorized the withdrawal of money from Sommet's account well in excess of the 3% in administrative fees that he could rightfully claim. That shows a deprivation of property.

Yes, Sommet's operating account contained many pools of funding. But that does not free Whitfield of liability. The government established that the money withdrawn for non-client purposes far exceeded the 3% fee. This necessarily means that Whitfield was using client, not Sommet, money for at least some of his expenditures. The evidence also makes clear that for each count of wire fraud, the wired funds were in fact misappropriated.

Consider these illustrations of the fraud. On July 16, 2009, Sommet withdrew approximately $77,500 from Pener's Men's Warehouse account (count 2). Nonetheless, starting in late 2009, Pener began receiving notices of unpaid state taxes, including accrued interest and penalties for its fourth quarter 2009 taxes, which Sommet paid late. On November 18, 2009, Sommet wired around $71,000 from Forklift Systems (count 3). Yet in January 2010, Forklift's CFO learned that Sommet was not depositing funds into its employees' 401(k) plans. On May 5, 2010, Sommet transferred around $41,000 from Hometown Quotes' account (count 4). The following month, Hometown was served for failing to pay state unemployment taxes. Neither we nor the jury may be able to say where each dollar actually went. But we can say, and most importantly the jury could reasonably say, that the funds did not go where they were supposed to go. On this record, a reasonable jury could find Whitfield guilty of wire fraud.

*Money laundering*. Whitfield raises a parallel challenge to the money-laundering conviction, arguing (and conceding) that this conviction rises or falls based on the fate of his wire-fraud argument. It must fall. *See supra.*

*ERISA Embezzlement*. This challenge follows a similar arc. Whitfield maintains that no evidence ties the 401(k)-dedicated funds to any inappropriate withdrawals from the Sommet operating account and no money at any rate went missing from the plan. He is wrong each time.

Embezzlement from an ERISA plan occurs when a person "embezzles, steals, or unlawfully and willfully abstracts or converts" any money from an ERISA employee benefits plan for "his own use or . . . the use of another." 18 U.S.C. § 664. To act "willfully," the defendant must have the "specific intent" to deprive the plan of its funding. *United States v. Busacca*, 936 F.2d 232, 239–40 (6th Cir. 1991).

The government presented ample evidence to show just that. Testimony showed that Whitfield withdrew money from Sommet's clients' accounts, took 401(k) contributions from the employee paychecks it processed, and yet failed to pass all of the designated funds to the 401(k) recipients. These actions led to a shortfall for a number of Sommet clients as well as the resignation of Sommet's investment advisor and 401(k) plan administrator. During this same time, Whitfield used the company account for a variety of non-client expenditures. A rational juror could conclude that this violated § 664. *See United States v. Whiting*, 471 F.3d 792, 800–01 (7th Cir. 2006). Testimony confirmed the shortfall, which disproves Whitfield's claim that the plan was fully funded.

*IRS Fraud*. In challenging this conviction, Whitfield argues that the government failed to prove the inaccuracy of his tax reports. To prove tax fraud, the government must show that the defendant believed the information filed was not "true and correct as to [a] material matter."

26 U.S.C. § 7206(1). But it need not examine the company's internal data to do so. "Certainly the government would prefer to have direct rather than circumstantial evidence," but "the possibility of better evidence does not imply that the extant evidence is insufficient." *United States v. Kington*, 875 F.2d 1091, 1102–03 (5th Cir. 1989).

The record is brimming with credible evidence that Byrd's (and not Whitfield's) numbers reflected the accurate wage and tax liabilities for Sommet and its employees. The jury had ample grounds for crediting Byrd's testimony that she created her spreadsheets meticulously, using Darwin system data and primary sources to verify those numbers. In addition, Marsha forwarded Byrd's spreadsheets to Whitfield. A jury could readily discredit Whitfield's testimony that he saw these emails but not the attachments, especially given that numbers from the spreadsheet appear on one line of his 941 filings. But even if Whitfield never saw the spreadsheets, Marsha's belief that Byrd's data would be useful to him belies the notion that Byrd's numbers were misstated to the tune of millions of dollars. The same goes for the fact that Byrd's numbers appeared on the employee W2 forms. It is fair to assume that an employee would speak up if his or her wages were so grossly overstated on these W2 forms. Although Whitfield argues that the Darwin System was not accurate, numerous others testified it was. The jury was entitled to credit the latter testimony.

Perhaps most fundamentally, the gaping difference between the numbers reported by Byrd and those reported by Whitfield strongly suggests that the discrepancy went beyond inadvertence or system error. Other facts bolster this conclusion: (1) Sommet's employee base was steady or growing (not contracting as Whitfield's 941 reports suggested); (2) the income Whitfield reported was not sufficient to cover even Sommet's own internal employees (let alone its clients' employees); and (3) Whitfield had a motive to understate given Sommet's serious

cash flow problems. Put together, this was more than enough to convince a rational juror that Byrd, not Whitfield, reported accurate figures.

*Conspiracy.* Whitfield challenges the jury's finding that he conspired with his (then) wife and his (then) father-in-law to commit these crimes. To establish a conspiracy, the government must prove (1) an agreement between two or more people to violate the law, (2) a decision by the defendant to join the conspiracy, and (3) an affirmative act by the defendant ("any act to effect the object of the conspiracy"). 18 U.S.C. § 371; *see Sadler*, 750 F.3d at 593.

Whitfield attacks the government's proof on the agreement and knowledge fronts. To show an agreement, the government need only prove that the co-conspirators "in some way or manner . . . came to a mutual understanding to try to accomplish a common and unlawful plan." *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990). "Proof of a formal agreement is unnecessary." *Id.* Indeed, "a tacit or material understanding among the parties is sufficient." *Id.* "Circumstantial evidence and direct evidence are accorded the same weight, and the uncorroborated testimony of an accomplice may support a conviction." *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991) (quoting *United States v. Frost*, 914 F.2d 756, 762 (6th Cir. 1990)).

The government offered plenty of evidence of an understanding between Whitfield and Marsha to deprive clients of pre-designated funds and to use the interstate wires in doing so. At trial, Marsha admitted multiple times that she was aware that client money was being used to fund her "lifestyle" and that this was contrary to promises made to the company's clients by Whitfield and others. R. 217 at 29, 31. She added that this scheme "became very apparent" to all those at Sommet "who were working together trying to buy time." *Id.* at 30. And she admitted to covering up Whitfield's fraud through false representations to Sommet clients and to

wiring money at Whitfield's request from Sommet's corporate account to the family's personal account. Crediting this testimony, as we must, a reasonable jury could conclude that a mutual agreement existed between Brian Whitfield and Marsha Todd.

As to knowledge, "proof that the defendant knew the essential object of the conspiracy" suffices. *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986) (quotation omitted). As shown, there is ample evidence that Whitfield knew he was defrauding his clients. To that same end, ample evidence shows that he knowingly engaged Marsha in this endeavor. Whitfield knew that the Sommet account contained designated client funds, as he admitted. And he knew that the company was falling short on client obligations in 2009 and 2010. Nonetheless, he instructed Marsha to use that money to cover his personal expenses during that time.

Marsha and Ed, it is true, both deny having any formal conversations or explicitly agreeing to participate in a fraud. But conspiracy, as shown, does not require a formal or explicit agreement. *See Pearce*, 912 F.2d at 161. That Marsha and Whitfield agreed to use client money for personal expenses (with Marsha's acknowledgement that this money consisted of "[c]lient [] payrolls") supplies sufficient circumstantial evidence of a tacit agreement to support the conviction. R. 217 at 39–40.

IV.

*Sentencing*. Whitfield challenges his sentence on procedural and substantive grounds. Procedurally, Whitfield argues that issue preclusion limited the Guidelines' loss calculation to $1.8 million, the amount of forfeiture determined by the jury. "[O]nce an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits" involving the same party. *Montana v. United States*, 440 U.S. 147, 153 (1979).

But for issue preclusion to apply, the issue must be identical to the issue resolved in the earlier case. *See Hammer v. I.N.S.*, 195 F.3d 836, 840 (6th Cir. 1999).

As the district court correctly held, forfeiture and loss are not the same. Forfeiture measures "any profits that the offender realized from his illegal activity." *United States v. Boring*, 557 F.3d 707, 714 (6th Cir. 2009). Loss measures "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, cmt. 3(A)(i). The burdens of proof for each also differ. A jury's forfeiture verdict must be determined beyond a reasonable doubt; a judge makes the loss calculation by a preponderance of the evidence.

Substantively, Whitfield argues that the unpaid medical claims were inappropriately included in the loss calculation. This argument suffers from a similar flaw. The healthcare misconduct *was* a part of the charged conduct, namely the wire fraud and conspiracy to commit wire fraud. And the loss associated with the unpaid medical claims was a "foreseeable pecuniary harm" resulting from those crimes.

For these reasons, we affirm.