NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0041n.06

Nos. 21-1616/1639/1670

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
|  | ) | Jan 20, 2023 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
| RONALD LEE SUTHERLAND (21-1616); | ) | COURT FOR THE WESTERN |
| TIMOTHY MARK CALICUTT (21-1639); | ) | DISTRICT OF MICHIGAN |
| DWAYNE DESHAUN PARKS (21-1670), | ) |  |
|  | ) | OPINION |
| Defendants-Appellants. | ) |  |
|  | ) |  |

Before: SUHRHEINRICH, CLAY, and DAVIS, Circuit Judges.

**DAVIS, Circuit Judge.** In these consolidated appeals, Defendants Ronald Sutherland, Timothy Calicutt, and Dwayne Parks appeal from their respective judgments in the United States District Court for the Western District of Michigan. Following a joint trial, a jury convicted all three defendants of various firearm and drug offenses. The district court then imposed sentences, which Sutherland and Parks now appeal. Calicutt appeals his convictions, and the district court's failure to declare a mistrial. For the reasons that follow, we **AFFIRM** in part, **VACATE** in part, and **REMAND** for further consideration in light of this opinion.

## I.

This case concerns a methamphetamine trafficking conspiracy in Western Michigan. Government officials were first alerted to the conspiracy in late 2019, when the United States Postal Inspection Service intercepted multiple packages containing methamphetamine traveling from

California to Chicago. Investigators subsequently identified several men suspected of being Chicago-based methamphetamine suppliers and learned that they were making regular trips to Kalamazoo, Michigan. In February 2020, in coordination with the Drug Enforcement Administration taskforce in Kalamazoo, investigators identified Defendant Dwayne Parks as an individual meeting with the Chicago-based suppliers in Kalamazoo. In March 2020, a deputy sheriff pulled Parks over during a routine traffic stop while Parks was driving a vehicle registered to Defendant Timothy Calicutt. The deputy arrested Parks for driving without a license and, during the subsequent inventory search of the vehicle, recovered baggies containing a total of 73.2 grams of methamphetamine.

In interviews following his arrest, Parks described taking orders for methamphetamine from individuals in and around Kalamazoo and placing the orders for three to ten pounds at a time with the Chicago-based suppliers. Parks was subsequently released from jail, but investigators continued conducting electronic and physical surveillance of Parks, Calicutt, and other suspected conspirators. Specifically, agents identified a home on Race Street in Kalamazoo that was associated with Calicutt and set up surveillance cameras outside the residence. At trial, the government presented surveillance footage and testimony describing a pattern of events between May and June of 2020. The pattern began with investigators receiving vehicle tracker alerts that the Chicago supplier was traveling to Michigan. Parks would then meet with and retrieve U.S. postal packages from the source in Kalamazoo, and then travel to the residence on Race Street.

On June 22, 2020, while surveilling Parks, agents saw him meet with Defendant Ronald Sutherland at a Kalamazoo gas station where he handed Ronald a bag. Ronald left the scene in a vehicle, and officers pulled him over shortly after. Ronald was on the driver's side and his cousin, Michael Sutherland, was on the passenger's side. A search of the vehicle uncovered two pounds

of methamphetamine and an unloaded firearm underneath the passenger seat at Michael's feet. At the stop, Michael initially told officers that both the drugs and gun belonged to him. Within three days, Michael changed his tune; he informed a detective that the drugs actually belonged to Ronald and were purchased shortly before the traffic stop. At trial, Michael claimed that the gun did not belong to him either – it was Ronald's gun that he had been trying to sell to Michael.

Based on the preceding investigation, agents obtained several federal search warrants, including warrants for Calicutt's Race Street residence, a house Parks frequented on Charlotte Avenue, and two vehicles. On June 25, 2020, investigators again were alerted that the Chicago source was traveling to Kalamazoo. Surveillance units watched as Calicutt and Parks arrived at a meeting spot; Parks exited the vehicle that Calicutt was driving, retrieved two postal boxes from the Chicago source, and returned to the vehicle. As the two were later pulling into the driveway at the Race Street house, agents converged on the location to execute the search warrant. Calicutt fled on foot, but the officers quickly detained both him and Parks.

In their search of the vehicle that the pair had just exited, officers found the two postal boxes containing a total of approximately 11 pounds of methamphetamine. Inside the Race Street house, agents found two digital scales; a 9mm semiautomatic pistol underneath couch cushions; and $11,600 in cash behind drywall and in a shoebox. In addition to the scales, cash, and guns, agents found common cutting agents for methamphetamine: caffeine powder and 14 two-pound bags of methylsulfonylmethane, or "MSM," which is an advanced joint supplement for horses. Agents also retrieved residency documents for Calicutt, including his birth certificate, a utility bill, and a quitclaim deed to the property. When he was arrested and searched, officers found an additional $8,600 in cash on Calicutt's person.

At the Charlotte Avenue address, agents located the two vehicles they had obtained search warrants for parked in the driveway. Surveillance confirmed that Parks drove both vehicles at various times throughout the investigation. In one of the vehicles, agents found a digital scale and Parks's ID card. In the other, agents found a backpack containing a Ziploc bag with methamphetamine. Upstairs in the Charlotte Avenue home, agents found more Ziploc bags with methamphetamine residue, and a trash bag containing empty U.S. postal boxes with empty heat-seal packaging material.

Based on the investigation, a grand jury returned an eight-count indictment against Calicutt, Parks, Ronald Sutherland, and Michael Sutherland. The indictment charged Defendants as follows: Count One charged Calicutt, Parks, and both Sutherlands with conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 846; Count Two charged Parks with possession with intent to distribute 50 grams or more of methamphetamine under 21 U.S.C. § 841(a)(1); Count Three charged Michael and Ronald Sutherland with possession with intent to distribute 50 grams or more of methamphetamine under 21 U.S.C. § 841(a)(1), and aiding and abetting under 18 U.S.C. § 2; Count Four charged Michael Sutherland with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g); Count Five charged Michael Sutherland with possessing a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c)(1)(A)(i); Count Six charged Calicutt and Parks with possession with intent to distribute 50 grams or more of methamphetamine under 21 U.S.C. § 841(a)(1), and aiding and abetting under 18 U.S.C. § 2; Count Seven charged Calicutt as a felon in possession of a firearm under 18 U.S.C. § 922(g); and Count Eight charged Calicutt with maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1). Michael Sutherland entered a plea deal as to Counts One and Five and agreed to cooperate with the investigation and prosecution of his

codefendants. Calicutt, Parks, and Ronald Sutherland proceeded to a joint trial, and a jury convicted them on all counts.

The district court sentenced Parks to 240 months in prison, varying downwards from the Guidelines-calculated 360 months to life. In doing so, the court overruled his objection to a two-level enhancement for maintaining a drug house under U.S.S.G. § 2D1.1(b)(12). The district court sentenced Sutherland to the mandatory minimum sentence of 120 months for both of his counts, to run concurrently. The court overruled Sutherland's objection to the determination that he was not safety-valve eligible under U.S.S.G § 5C1.2.[1]

## II.

Each Defendant challenges the district court's judgments on unique grounds. Calicutt challenges the sufficiency of the evidence at trial. He also asserts that the court should have declared a mistrial on Confrontation Clause grounds after Parks's counsel told the jury that Parks incriminated Calicutt when speaking with police. Next, Parks alleges that the district court erred in applying a two-point sentence enhancement for maintaining a drug house. Finally, Sutherland argues that the district court erred in finding him ineligible for "safety valve" treatment at sentencing. We consider each defendant's claims in turn.

### 1. Timothy Calicutt

#### a. *Sufficiency of the Evidence*

Calicutt first asserts that the government failed to prove all the elements necessary to convict as to each of his four counts. We review *de novo* a district court's denial of a motion for a judgment of acquittal. *United States v. Howard*, 947 F.3d 936, 947 (6th Cir. 2020). In reviewing the sufficiency of the evidence, a jury's conviction is supported if – taking the evidence in the light

---

[1] The district court sentenced Calicutt to a total of 240 months in prison, varying downward from the Guidelines range of life in prison. He does not challenge his sentencing determination on appeal.

most favorable to the prosecution – "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Soto*, 794 F.3d 635, 657 (6th Cir. 2015) (quoting *United States v. Lutz*, 154 F.3d 581, 587 (6th Cir. 1998)). Reversal is only permitted upon a finding that "the judgment is not supported by substantial and competent evidence, whether direct or wholly circumstantial, upon the record as a whole." *United States v. Hall*, 549 F.3d 1033, 1040 (6th Cir. 2008) (citing *United States v. Barnett*, 398 F.3d 516 (6th Cir. 2005)). Accordingly, in lodging these challenges, Calicutt bears a "very heavy burden." *United States v. Ramer*, 883 F.3d 659, 682–83 (6th Cir. 2018) (quoting *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986)). Despite his arguments to the contrary, the evidence adduced at trial was more than sufficient for any rational juror to convict Calicutt as to all counts.

Count One charged Calicutt with conspiracy to distribute and possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 846. To sustain a conviction for this count, the government had to prove: "1) an agreement to violate the drug laws, and 2) each conspirator's knowledge of, intent to join, and participation in the conspiracy." *United States v. Crozier*, 259 F.3d 503, 517 (6th Cir. 2001) (citing *United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir. 1998)). In terms of evidence, "a defendant's knowledge of and participation in a conspiracy may be inferred from his conduct and established by circumstantial evidence." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) (citation omitted). Calicutt does not dispute that Parks was indeed engaged in illegal drug activity. He does, however, dispute that the government established that he intended to engage in such activity with Parks.

Relatedly, Count Two charged Calicutt with possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1). At trial, the government was required to show that Calicutt (1) knowingly or intentionally possessed methamphetamine (2) with the intent

to distribute it. In this same count, he was charged as an aider and abettor, pursuant to 18 U.S.C. § 2. Therefore, the government could also satisfy its burden as to Count Two by establishing that (1) Calicutt intended to help or encourage a principal to commit the crime of possession with intent to distribute, and (2) the principal committed the crime. Calicutt asserts that he was convicted on both Count One and Two "without any evidence that he bought, sold, or acquired the contraband, constructively or otherwise." A cursory review of the record proves this claim demonstrably unfounded.

At trial, the government presented video and testimonial evidence regarding Parks's practice of retrieving postal boxes from Chicago suppliers and subsequently traveling to Calicutt's Race Street home. This evidence included surveillance video showing that on at least one occasion, Parks entered the Race Street house carrying a white postal box and exited without it. The government also offered testimony and physical evidence regarding the fruits of the June 25, 2020 searches, including 11 pounds of methamphetamine recovered from Calicutt's vehicle after he and Parks met with the Chicago suppliers, and common cutting agents, digital scales, a loaded firearm, and significant amounts of cash recovered from the Race Street house. A Michigan State Police intelligence analyst provided opinion testimony that text messages extracted from Parks's and Calicutt's cell phones were related to methamphetamine transactions. Then, testimony elicited at trial established that when Calicutt was released on bond, he fled the state and was apprehended living under an alias in Indiana; this was in addition to his brief flight on foot the day of the June search – evidence which the jury was free to attribute to consciousness of guilt.[2] And if the

---

[2] The jury was free to consider such evidence in part because Calicutt did not challenge its admissibility. Had Calicutt challenged its admissibility, this Court would review its admissibility under the standard articulated in *United States v. Oliver*, 397 F.3d 369, 376 (6th Cir. 2005) ("For evidence of flight to be of probative value, four inferences must be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.").

foregoing were not enough, the government called Calicutt's pretrial cellmate, Jervon Ward, to testify at trial. Ward relayed Calicutt's detailed descriptions to him of his drug-dealing scheme, including his sources, the quantity, price, and frequency of meth purchases, how much cash officers seized the day of his arrest, and his confidence in his case because he'd been careful to always send "the other guy" to meet with suppliers. Phone records produced at trial corroborated this account. These records showed abundant communications between Calicutt and Parks, and between Parks and the Chicago suppliers, but never among Calicutt and the Chicago suppliers.

On appeal, Calicutt casts Ward as an unreliable narrator. He emphasizes Ward's history as a career offender and that Ward frequently cooperates with the government in criminal cases. He also claims that Ward learned the alleged information because Calicutt himself shared his discovery packet with him – an assertion that arguably *corroborates* Ward's account that Calicutt discussed the case with him. In any event, Calicutt's counsel explored all of the foregoing challenges to Ward's testimony at trial on cross-examination, and the jury was free to make its own determinations as to the weight and credibility of the evidence. *See United States v. Burris*, 999 F.3d 973, 980 (6th Cir. 2021) ("When considering a challenge to the sufficiency of the evidence, we may not weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." (citations, alteration, and internal quotation marks omitted)). Thus, Calicutt's present attempt to discredit the substantial evidence introduced against him fails.

It is undisputed that Parks possessed methamphetamine with the intent to distribute in furtherance of the conspiracy. And there is ample evidence that he and Calicutt partnered in that endeavor. Drawing all reasonable inferences in favor of the government, the evidence adduced at trial was clearly sufficient for a rational juror to convict as to Counts One and Two.

Next, Count Seven charged Calicutt with being a felon in possession of a firearm based upon the discovery of a loaded 9mm pistol underneath couch cushions at his Race Street residence. *See* 18 U.S.C. § 922(g)(1). Possession may be actual or constructive. *United States v. Raymore*, 965 F.3d 475, 483 (6th Cir. 2020). While actual possession requires physical control over the weapon, relevant here, constructive possession exists when an individual "knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Gardner*, 488 F.3d 700, 713 (6th Cir. 2007) (quoting *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998)). Constructive possession can thus be established where the defendant merely "has dominion over the premises where the firearm is located." *Id.* Here, Calicutt only disputes whether the jury had sufficient evidence from which it could reasonably conclude that he exercised "dominion" over the Race Street premises.

To begin, the government presented undisputed evidence in the form of a quitclaim deed in his name, that Calicutt owned the Race Street home. *See United States v. Hill*, 142 F.3d 305, 312 (6th Cir. 1998) (quoting *United States v. Morris*, 977 F.2d 617, 620 (D.C. Cir. 1992)) ("A jury 'is entitled to infer that a person exercises constructive possession over items found in his home.'"). Further, agents found other indicia of residency, including his birth certificate and a utility bill in his name. However, Calicutt testified at trial that his minor sons lived with him, and that he rented a room to Parks that he would occasionally occupy. When "multiple individuals occupy a residence, we typically require an additional statement or circumstance to connect the defendant to contraband found on the premises." *United States v. Latimer*, 16 F.4th 222, 225–26 (6th Cir. 2021) (citing *United States v. Crumpton*, 824 F.3d 593, 609 (6th Cir. 2016)). The government here presented such additional statements. Specifically, the government played for the jury and admitted into evidence a recorded jail call from June 25, 2020, the night of Calicutt's arrest. During the call,

Calicutt tells the caller "they found a gun in my house." The caller questions what he was doing with a gun, and Calicutt replies that a "lot been going on." Finally, Ward testified that Calicutt told him that he purchased a firearm to protect his family. Construing the foregoing in the government's favor, a jury reasonably could have concluded that Calicutt constructively possessed the firearm found in his home.

Lastly, Count Eight charged Calicutt with maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1). Under Section 856(a)(1), the government was required to show that Calicutt knowingly used or maintained Race Street for the purpose of manufacturing, distributing, or using a controlled substance. Calicutt does not appear to dispute that he knowingly maintained the home. But he insists that "the record is barren with regard to any actual drug activity occurring on the premises." That is, he argues, the jury could not have reasonably concluded that methamphetamine was being distributed from Race Street because there was no methamphetamine found in the home and "no evidence that methamphetamine had ever left the home."

Again, Calicutt's claims that the government did not carry its burden on this count lack merit. The circumstantial and direct evidence discussed herein was more than enough for a rational jury to find that Calicutt manufactured and distributed methamphetamine from his Race Street home – including the various indicia of drug manufacturing found in the home, Ward's trial testimony, and Parks's repeated visits to the home following his purchases from the Chicago sources.

Finally, Calicutt asserts that his own testimony that his two teenage sons resided in the home, and photographs taken during the search of "everyday items one would expect to find in a living space" rebut "the government's presentation of the home as largely [sic] empty vessel used only as a lab for the surreptitious preparation of methamphetamine." But it is well established that drug related activity "need not be a defendant's sole or primary purpose" in maintaining a home to

satisfy § 856(a)(1). *United States v. Lang*, 717 F. App'x 523, 546 (6th Cir. 2017); *see also, e.g.*, *United States v. Sadler*, 750 F.3d 585, 592-93 (6th Cir. 2014) (explaining the same). Rather, "drug-related uses of the premises must have been at least 'significant or important'" as opposed to "casual[.]" *United States v. Elenniss*, 729 F. App'x 422, 429 (6th Cir. 2018) (quoting *United States v. Russell*, 595 F.3d 633, 642–43 (6th Cir. 2010)). The evidence presented to the jury tended to show that Race Street was something of a home base for the conspiracy, where Parks would deliver Calicutt methamphetamine that Calicutt would then cut and deal – certainly a "significant" purpose with respect to the underlying scheme.

Drawing all reasonable inferences in the government's favor, the evidence adduced at trial is sufficient to support the jury's finding that Calicutt is guilty of all charges brought against him.

### b. Mistrial

Calicutt lastly asserts that the district court erred in failing to declare a mistrial after the jury was told that Parks incriminated Calicutt when speaking with police. "When reviewing the trial decision of a federal district court, the standard of review for a decision not to grant a mistrial is abuse of discretion." *Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003) (citation omitted). Calicutt asserts that Parks's counsel's mention of Calicutt implicated the Confrontation Clause under the *Bruton* rule. *See Bruton v. United States*, 391 U.S. 123 (1968). Calicutt cites this court's explanation of the *Bruton* rule in *United States v. Al-Din*, where we expounded that "a codefendant's out-of-court statement implicating the defendant cannot be admitted at a joint trial where the codefendant declines to testify" except when the statement has been "redacted to eliminate not only the defendant's name, but any reference to his or her existence." 631 F. App'x 313, 321 (6th Cir. 2015) (quotations and citations omitted). Calicutt's claim here refers to the following exchange during closing arguments:

> [PARKS'S COUNSEL]: What does Mr. Parks do?  A week later, Mr. Parks meets with Special Agent Williamson.  Meets with her July 2nd, as she said.  They've already arrested, detained Mr. Parks and Mr. Calicutt.  So on that July 2nd meeting, that was the first meeting where Mr. Parks mentioned Mr. Calicutt's name.  So Mr. Calicutt cannot say that Mr. Parks turned the heat up --
>
> [CALICUTT'S COUNSEL]: Objection, Your Honor.  I think we're arguing facts not in evidence.
>
> THE COURT: We're going to let it go, [].
>
> [PARKS'S COUNSEL]: Okay.
>
> THE COURT: The jury can sort out what was and was not properly admitted.
>
> [PARKS'S COUNSEL]: All right.  So Mr. Parks mentions Mr. Calicutt's name for the first time July 2nd.  First time he mentioned the guy's name -- July 2nd.  Not March, not May. July.

In context, Parks's counsel seemingly makes this statement in response to Calicutt's own closing argument, where counsel first references Parks:

> [I]t seems like this case starts really on March 9th when it is Dwayne Parks who gets arrested in Allegan County. . . .  And what does he -- what does Dwayne Parks do?  Then he gives his statement.  And it's Dwayne Parks' [sic] statement at that time where he admits to distributing methamphetamine, but he's just trying to claim that all he is in that situation is a middleman.  That's what he claims.

Thus, it would appear Calicutt's own counsel first placed the inference regarding Parks discussing Calicutt with police in the minds of jurors.  Regardless, we need not decide Calicutt's claim of constitutional error because any such error was harmless.  *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (applying harmless error standard to Confrontation Clause violations); *see also Stanford v. Parker* 266 F.3d 442, 456–57 (6th Cir. 2001) (holding that because there was overwhelming evidence of defendant's guilt, any *Bruton* violation constituted harmless error).  In light of the overwhelming evidence of Calicutt's guilt, counsel's passing mention of his name during Parks's closing argument does not warrant the declaration of a mistrial.

## 2. Dwayne Parks

For his part, Parks challenges the court's sentencing determination. Pursuant to U.S.S.G. § 2D1.1(b)(12), the district court applied a two-level enhancement to Parks's offense level upon finding that he maintained a drug premises. We review the court's legal interpretation of the Guidelines *de novo*, and its factual determinations for clear error. *United States v. Byrd*, 689 F.3d 636, 639 (6th Cir. 2012).

The enhancement at issue here applies to any defendant who "(1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance." *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013). At sentencing, and again on appeal, the government argues that the enhancement could apply based solely on the physical evidence found in the Charlotte Avenue home associated with Parks. But even without this, the government asserts that the drug house enhancement should also apply to Parks based on his co-conspirator's relevant conduct – i.e., Calicutt's maintenance of the Race Street home. The district court found both arguments persuasive. In denying Parks's objection to the enhancement, the court reasoned that "there is enough of a nexus between Mr. Parks' [sic] activities both at Mr. Calicutt's house on Race Street and at the place where [he] was staying on Charlotte." We agree.

Calicutt's maintenance of the Race Street home can properly be imputed to Parks. At sentencing, Parks's counsel argued that Calicutt's Race Street home was the "drug operating point" for the conspiracy, as opposed to the Charlotte Avenue home. This argument supports a conclusion that the district court properly applied the enhancement. In *United States v. Rich*, this court affirmatively held that a drug premises enhancement can be based on a coconspirator's relevant conduct pursuant to U.S.S.G § 1B1.3(a)(1)(B). 14 F.4th 489, 497 (6th Cir. 2021). Here, the jury convicted Calicutt of maintaining a drug-involved premises. Further, Calicutt and Parks were

jointly engaged in a conspiracy; Calicutt's maintenance of the Race Street home as a drug premises was squarely "within the scope" and "in furtherance of" that conspiracy; and such maintenance was certainly reasonably foreseeable to Parks. § 1B1.3(a)(1)(B). Because Calicutt's maintenance of the Race Street home was sufficient to apply the enhancement to Parks, we needn't review the court's determination that Parks's maintenance of Charlotte Ave was also sufficient. The district court did not err in applying the enhancement.

### 3. Ronald Sutherland

Lastly, Ronald Sutherland's charges arise from the traffic stop and vehicle search executed on June 22, 2020. During the search, officers recovered a total of two pounds of methamphetamine and a .38 caliber pistol, both beneath Michael Sutherland's seat on the passenger side. On appeal, Ronald contends that the district court erred at sentencing in its application of the safety valve statute under 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2(a). We agree, and thus, remand is necessary.

Congress enacted 18 U.S.C. § 3553(f), or the "safety-valve" statute, out of concern "that the inflexibility of statutory mandatory minimum sentences was resulting in unjust punishments in some cases." *United States v. Adu*, 82 F.3d 119, 121 (6th Cir. 1996). With authority granted by Congress in § 3553(f), the United States Sentencing Commission promulgated a Guideline at U.S.S.G § 5C1.2 effectuating the statute's stated purposes – namely, to prevent the "least culpable offenders" from "receiv[ing] the same sentences as their relatively more culpable counterparts." *See* H.R. Rep. 103-460 (1994). Section 5C1.2(a) of the Guidelines requires a district court to ignore the statutory minimum sentences of certain drug-related offenses if the defendant meets five criteria – only two of which are in dispute here:

(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense; and

(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

The defendant has the burden of demonstrating, by a preponderance of the evidence, that he is eligible for § 5C1.2(a)'s safety-valve reduction. *United States v. Bolka*, 355 F.3d 909, 912 (6th Cir. 2004). We review a district court's factual findings concerning a defendant's eligibility for safety-valve relief for clear error. *United States v. Haynes*, 468 F.3d 422, 426 (6th Cir. 2006). And we review the district court's interpretation of a statute or Guidelines provision *de novo*. *United States v. Penn*, 282 F.3d 879, 881 (6th Cir. 2002).

At sentencing, the district court gave credence to Ronald's argument that he did not possess the firearm found at Michael's feet during the traffic stop "in connection with the offense" under § 5C1.2(a)(2). The court found persuasive the fact that the firearm was unloaded, and Michael's testimony that Ronald wanted to sell him the gun. But the court ultimately left the determination on this factor unresolved. Sutherland asserts on appeal that the court's failure to make a finding as to this factor was error. This point is not without some appeal, but the court did not make a conclusive finding on factor two because it found that factor *five* was dispositive as to Sutherland's eligibility for safety valve treatment. Therein lies the error.

Three weeks prior to sentencing, Sutherland met with the government for a proffer interview. At the interview, Ronald acknowledged obtaining two pounds of methamphetamine from Parks the night of the June 2020 traffic stop, but claimed that it was Michael's idea to make the purchase. He also denied selling methamphetamine for profit and claimed that Michael intended

to sell the two pounds to another distributor. Finally, Ronald claimed that he was unaware of the presence of the firearm in the vehicle and denied ownership altogether. In challenging Ronald's satisfaction of § 5C1.2(a)(5), the government highlighted the inconsistencies between Ronald's proffer and Michael's sworn testimony at trial, insisting that Ronald's version of events could not be deemed credible as a result. However, the court did not resolve the question of Ronald's satisfaction of § 5C1.2(a)(5) based on credibility. At the sentencing hearing, the government contended that Ronald is not the "true cooperator" that the safety valve statute contemplates – because a true cooperator "pleads guilty" and "doesn't go to trial." The court subsequently questioned the government: "[s]o before trial there was no proffer?" Shortly after, in declining to apply § 5C1.2(a), the court reasoned through the fifth and final factor as follows:

> When we get to factor (5), I am not – I know that the factor says *not later than the time of the sentencing hearing* the Defendant has truthfully provided the Government all information and evidence he has, which in this case wasn't much anyway. I think that clearly the fact that *Mr. Sutherland went to trial in this case*, and *only a very short time before sentencing* came forward and attempted a proffer with the Government is truly too little too late. I don't know if there is any – I haven't looked to see if there is any case law with regard to whether that applies only to Defendants who have pleaded guilty and then proffered. I don't know whether that covers Defendants who have gone to trial and then attempted to proffer, but I don't think that under the circumstances of this case, particularly with *the changing nature of the testimony* involving that gun. I think that that is – he fails to meet that part of the safety valve test, and accordingly, that objection to the scoring is likewise denied.

First, the court's reference to the "changing nature of the testimony involving [the] gun" is unclear. To the extent that accounts regarding the gun were "changing" over time, they were *Michael's* accounts – not Ronald's. At the scene of the stop, Michael claimed the gun as his own. Ronald's counsel noted at the sentencing that, in a proffer interview prior to trial, Michael claimed he purchased the gun somewhere in the southern United States. Yet, at trial, Michael asserted that the gun belonged to Ronald, and that Ronald was attempting to sell it to him. Meanwhile, Ronald

16

declined to testify at trial altogether. For the very first time during the proffer, he spoke to the ownership and presence of the gun – denying that it belonged to him or that he knew it was inside of the vehicle. Thus, Ronald's and Michael's accounts regarding the gun are inconsistent with each other. This inconsistency and the fact that, at least, one of Michael's recitations was made under oath – while Ronald's was not – could lead a court to conclude that Ronald was not truthful during his proffer, but the court announced no such finding when it ambiguously referenced only the "changing nature of the testimony" regarding the gun. *See Adu*, 82 F.3d at 125 ("In cases where a defendant produces specific evidence rather than more general statements as the basis for a claim of eligibility for safety valve treatment, the district court should make specific findings by reference to the criteria of the statute and guideline."). In view of Ronald's offer of specific evidence – a proffer in which Ronald admitted his involvement in acquiring methamphetamine but denied knowledge of the presence of a gun at the scene of his arrest, the court should have made specific credibility findings if it intended to reject on that basis. In this respect, the court clearly erred.

The court also seems to have improperly weighed the timing of Sutherland's proffer. The plain language of § 5C1.2(a) is unambiguous – a defendant must proffer "*not later than the time of the sentencing hearing*." § 5C1.2(a)(5) (emphasis added). Indeed, the district court acknowledged this language during the sentencing hearing, but registered uncertainty about whether the fact that Ronald's proffer came only after he had proceeded to trial rendered it "too little, too late." Yet, this court, albeit in an unpublished opinion, and several of our sister circuits have elucidated that proffers made pre-sentencing – and post-trial – are not untimely. *Briggs v. United States*, 187 F. App'x 540, 545 (6th Cir. 2006) (defendant had until sentencing, five months after conviction, to decide to give information to government to obtain benefit of safety valve); *see also United States v. Jeffers*, 329 F.3d 94, 99–100 (2d Cir. 2003) (holding that a defendant's perjury at trial did not

disqualify him from safety valve eligibility because "[t]o do so would contradict the plain language of the statute and contravene the statutory deadline for full compliance with its criteria at the time of the commencement of the sentencing hearing"); *United States v. Shrestha*, 86 F.3d 935, 940 (9th Cir. 1996) (explaining that "[t]he safety valve statute is not concerned with sparing the government the trouble of prepping for and proceeding with trial" in finding defendant safety-valve eligible after trial); *United States v. Powell*, 387 F. App'x 491, 496 (5th Cir. 2010) (per curiam) ("[T]he defendant need not debrief and provide truthful information at any particular time except prior to the commencement of the sentencing hearing."). Thus, Ronald's proffer three weeks before sentencing was not "too late."

Because we are left with the firm and definite impression that the court erred in holding the substance of Ronald's proffer against him without making specific findings, and in negatively assessing the timing of Sutherland's government debriefing under § 5C1.2(a), we vacate Sutherland's sentence and remand to the district court for resentencing in accordance with this decision. In particular, the district court must fully assess whether Sutherland's proffer complied with § 5C1.2(a)(5), including any credibility findings as appropriate. Further, though we have come to no conclusion as to whether the district court erred in relation to § 5C1.2(a)(2), we note that at resentencing the court will have the opportunity, if it remains pertinent, to clarify its findings regarding that factor.

### III.

Accordingly, we **AFFIRM** the district court's judgments as to Defendants-Appellants Calicutt and Parks. We **VACATE** Defendant-Appellant Sutherland's sentence and **REMAND** with instructions to resentence consistent with this opinion.